MARÍA JOSEFA FERNÁNDEZ WIDOW OF FORNARIS ET AL., Plaintiffs and Appellees, *v.* AMERICAN SURETY COMPANY OF NEW YORK ET AL., Defendants and Appellants.

Nos. R-63-296, R-63-201.        Decided January 24, 1966.

*Hartzell, Fernández & Novas* for appellants. *Alberto Picó, Francisco Ponsa Feliú,* and *A. Torres Braschi* for appellees.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Hernández Matos, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

## I

The question posed in this action for damages is whether the applicable law is the substantive law of St. Thomas, of

Puerto Rico, or the Federal Act of the United States. Also, whether or not the res ipsa loquitur doctrine should be applied.

The facts are the following. On Saturday, July 20, 1957, about 4:30 p.m., four persons left San Juan, Puerto Rico, by private plane on a pleasure trip to the neighboring island of St. Thomas. They were Carlos J. Alonso, Fernando Fornaris, Jr., Luis Ríos Algarín, and Antulio Guillermo Molina. The plane was piloted by Carlos J. Alonso, vice president and controlling stockholder of defendant Radiotelephone Communicators of Puerto Rico, Inc. That corporation was the owner of the plane on which they were traveling: a single-engine, four-seater Cessna, model 182.

The plane was registered and regularly stationed in San Juan. The aforementioned four persons were residents and citizens of Puerto Rico. The Radiotelephone Communicators is a domestic corporation. Codefendant American Surety Co. of New York is a foreign corporation authorized to do business in Puerto Rico. Plaintiffs are also citizens and residents of Puerto Rico. Ríos Algarín, a professional attorney at law, was secretary of Radiotelephone Communicators; Molina, an accountant, worked for that corporation. Fornaris was an attorney at law practicing in Puerto Rico.

The Cessna plane arrived safely on that afternoon at St. Thomas. On the evening of that day, at 11:29 p.m., the plane took off on the return trip to Puerto Rico with the same four occupants. As before, Carlos Alonso piloted the plane. According to the flight schedule, the plane was due in Puerto Rico 36 minutes later, that is, at 12:05 a.m. of July 21. The plane never arrived in Puerto Rico. Nothing more was heard of it nor of its passengers. The unquestioned presumption is that the plane sustained an accident at some time during the return trip, that it crashed in the sea and that its four passengers perished.

Plaintiffs are close relatives of the late Fornaris, Ríos Algarín, and Molina. They are the following: the widow, three children, the father and two brothers of Fernando Fornaris, Jr.; the widow and two children of Ríos Algarín; and the widow, three children, and the mother of Antulio Molina. Defendants are the corporation owner of the plane and its insurer. The claim for damages was for the sum of $500,000.

The Superior Court sustained the complaint and ordered defendants to pay solidarily to plaintiffs the sum of $255,000, plus the costs and $20,000 for attorney's fees. A motion for reconsideration having been filed by defendants, the Superior Court set aside the judgment of attorney's fees but ratified the other pronouncements of the judgment. Defendants have appealed to us from the judgment, and plaintiffs from that part thereof, as modified by the order, setting aside the award of attorney's fees. We have consolidated both appeals.

Appellants assign four errors which we sum up below: (1) That the Superior Court erred in applying the law of Puerto Rico. (2) That the court erred "in rejecting and in not giving any weight to the evidence presented by defendants-appellants and to that offered, but not admitted, on the place where the alleged accident occurred, and also erred in failing to admit such evidence." (3) That the court erred in holding that the accident was due exclusively to the negligence of pilot Alonso, and in applying the res ipsa loquitur doctrine notwithstanding plaintiffs' admission that they did not know how the accident occurred. (4) That the court erred in ordering defendants to pay the aforementioned compensation thereby depriving them of their property without due process of law in violation of the Constitutions of Puerto Rico and of the United States.

■ Let us see in the first place what role the Federal Act plays—or does not play—in this case. In 1920, the Congress of the United States enacted the Act known as "Death on

the High Seas Act," 41 Stat. 537, 46 U.S.C. §§ 761–67. That Act created a right of action to cover those cases in which death occurs on high seas through fault or negligence, and vested jurisdiction in the United States District Courts, acting as Admiralty Courts, to entertain those actions.

■ Although it is considered that the legislative intent was unquestionably to provide a right of action for deaths on the high seas occurring in connection with seagoing vessels, the case law has extended the application of that Act to deaths occurring in high seas as a result of aviation traffic. See Annotation, *"Proper forum and right to maintain action for airplane accident causing death over or in high seas."* 66 A.L.R.2d 1002, 1004.

Having conceded that the said Federal Act covers aviation accidents causing deaths in high seas, there still remains for decision the question of whether the state courts have jurisdiction to take cognizance of an action of that nature through the recognition of a right of action exercised in pursuance of the state law. That is, whether the federal and state spheres have concurring jurisdiction or, on the contrary, whether federal jurisdiction is exclusive.

Section 7 of the Federal Act, *supra*, provides in part that "The provisions of any State statute giving or regulating rights of action or remedies for death shall not be affected by this chapter."[1]

It seems at first blush that that language permits in those cases the concurring jurisdiction of the federal and state spheres. However, the construction placed by the courts on that Act is not uniform, and three main positions are maintained: One, which absolutely excludes the state concurrence; another, which permits it on the basis of above-copied provision; and a third one, which permits the state concurrence

---

[1] "The provisions of any State statute giving or regulating rights of action or remedies for death shall not be affected by this chapter." 46 U.S.C. § 767.

provided the substantive rights of the litigants under the state law agree in their extent and limitations with the provisions of the federal statute. However, the weight of authorities is tilted in favor of the aforementioned first position. *Jennings* v. *Goodyear Aircraft Corp.*, 227 F.Supp. 246 (1964); *Ledet* v. *United Aircraft Corp.*, 176 N.E.2d 820 (1961); *Blumenthal* v. *United States*, 189 F.Supp. 439 (1960), *aff'd*, 306 F.2d 16; *Higa* v. *Transocean Airlines*, 230 F.2d 780 (1955), *cert. denied*, 352 U.S. 802; *Wilson* v. *Transocean Airlines*, 121 F.Supp. 85 (1954); *Sierra* v. *Pan American World Airways, Inc.*, 107 F.Supp. 519 (1952); *Noel* v. *Línea Aeropostal Venezolana*, 247 F.2d 667 (1956); *cf. The Tungus et al.* v. *Skovgaard*, 358 U.S. 588, 593–94 (1958); *Southern Pacific Co.* v. *Jensen*, 244 U.S. 205 (1916). See, also, the Annotation *supra* in 66 A.L.R.2d 1002; the Note, *"Admiralty: Uniformity: Application of State Statute to Maritime Contract,"* 36 Cornell L.Q. 355 (1951); and 1 Kreindler, Aviation Accident Law 74 *et seq.*, § 2.10 (1963).

Although the Supreme Court of the United States has not expressly made any pronouncement on this question, in *The Tungus et al.* v. *Skovgaard, supra,* it stated the following at pp. 593–94:

"The legislative history of the Death on the High Seas Act discloses a clear congressional purpose to leave 'unimpaired the rights under State statutes as to deaths on waters within the territorial jurisdiction of the States.' [Citations omitted.] The record of the debate in the House of Representatives preceding passage of the bill reflects deep concern that the power of the States to create actions for wrongful death in no way be affected by the federal law. [Citation omitted.]

"There is no merit to the contention that application of state law to determine rights arising from death in state territorial waters is destructive of the uniformity of federal maritime law."

As it may be seen, this language is confined to the power of the states to regulate the matter of deaths occurring in

their jurisdictional waters. We believe it is probable that the argument of desirability of uniformity as to the maritime law, adduced in *Southern Pacific Co.* v. *Jensen, supra,* in addition to the legislative history of the Death on the High Seas Act, shall serve as a basis for the Supreme Court of the United States to refuse jurisdiction to the states, at the proper time, over deaths occurring on high seas.

■ Notwithstanding the foregoing, the case at bar is not covered by the federal statute. This is so because the evidence offered at the trial does not establish, and is not even sufficient for us to conclude, by inference, that the Cessna 182 crashed on the high seas. This is also the weighing of the trial court. In this connection, it is highly significant that, according to the stipulation of the parties at the pretrial conference, "on September 24, 1958, plaintiffs filed a complaint involving these same facts in the United States District Court of Puerto Rico, and that that action was abandoned on January 9, 1962." Naturally, since plaintiffs were unable to establish in the United States District Court that the accident occurred in high seas, they were unable to establish federal jurisdiction. Subsequently they resorted to the Superior Court of Puerto Rico with the result already known.

What has been said above regarding the place where the accident occurred leaves us in the alternative that the same occurred in waters of St. Thomas or in waters of Puerto Rico.

Plaintiffs admit that they do not know how nor where the accident occurred, but, conceding that it did occur and that their above-named relatives lost their lives therein, the former rely on the doctrine of res ipsa loquitur—the thing speaks for itself—in order to recover damages from defendants.

Defendants, on their part, took the stand in the Superior Court that the accident occurred in territorial waters of the

Virgin Islands or on the high seas. They left open the possibility that the accident occurred on the high seas, as a second line of defense, but they actually strived to show that it occurred in Virgin Islands waters. In their memorandum of November 12, 1963, filed in the Superior Court after the latter decided the case, defendants allege and admit that the Superior Court "rejected defendants' contention that the accident occurred in the jurisdiction of the Island of St. Thomas, Virgin Islands."

To strengthen that position, defendants point out in their brief of April 26, 1965, that in proceedings for declaration of heirs brought before the Superior Court in 1957, when no action for damages had yet been filed by plaintiffs, the latter used a statement by Admiral Ryssy, and that on that occasion the Admiral said that the plane "crashed at sea somewhere between Charlotte Amalie and the Paso de Savana."[2] The Paso de Savana is a strait lying to the west of St. Thomas between that island and the Island of Savana. The distance between the west coast of St. Thomas and the east coast of Savana—which distance forms the strait known as Paso de Savana—is two miles. The Paso de Savana waters are territorial or jurisdictional waters of St. Thomas.

Before us defendants have taken the following positions in connection with the place where the accident occurred: (a) In their Petition for Review of December 20, 1963, defendants allege that if one of their witnesses, Admiral Ryssy, had testified, he would have said that the plane "crashed in jurisdictional waters of St. Thomas." (b) In their supple-

---

[2] The exact sworn statement made by Admiral Ryssy was the following: "From an examination of the information at hand, it is my opinion that Cessna N6084B crashed at sea somewhere between Charlotte Amalie and the Paso de Savana."

Admiral Ryssy was at the time of the occurrence Commander of the U.S. Coast Guard in San Juan and in the Antilles. He was in charge of the operations for the search of the lost plane, and went personally to the Virgin Islands in connection therewith.

mental brief of September 30, 1964, they assert, after citing a portion of Admiral Ryssy's statement, that such statement constitutes evidence that the Cessna 182 "crashed in waters of St. Thomas or perhaps on the high seas." (c) In their third brief, dated April 26, 1965, defendants allege that "all references made by Admiral Ryssy to the maritime letters marked G, H and I lie on the high seas." As it may be seen, position (b) does not help us, and positions (a) and (c) are conflicting between themselves, which does not help us either.

Which is, then, the situation on the matter? On matter of damages the application of the Federal Act is the exception, and in order that it may apply it is necessary to establish the federal jurisdiction. If applied, it would be in a federal court, pursuant to the statute *supra*. In order that that Act could be applied in this case, it was necessary to prove that the accident occurred on the high seas. This was not established and, therefore, we cannot conclude that the Federal Act applies.

The trial court considered insufficient defendants' efforts to show that the accident occurred in St. Thomas waters. It is true that there is no direct evidence to show where the accident occurred. It is also difficult to reach a conclusion on the matter owing to the diverse conflicting theories sustained by defendants at different stages of this litigation.

However, as we have already said, we cannot assume, in the absence of evidence, that the accident occurred on the high seas. Having already foreclosed the possibility of applying the Federal Act, there remain two alternatives that the accident occurred in waters of Puerto Rico or of the Virgin Islands, and believing, as we do, that on the basis of the entire evidence the most reasonable inference is that the plane crashed on waters of St. Thomas, we so accept it. That is the inference which seems to us most reasonable;

that was defendants' original position before the trial court; they presented evidence to that effect; and plaintiffs presented no evidence to controvert it.

## II

Having defined our position in the light of the facts, we must next determine what law should be applied to them and then consider whether or not defendants are civilly liable. The problem, it is clear, is whether the law of the Virgin Islands in force at the time of the occurrence (*lex loci delicti*), or the law of Puerto Rico (*lex fori*) should be applied. Since both laws are quite different, in their wording and in the underlying public policy, we are faced with a classical example of conflict of laws. The question is not decided in our written law, so that we must choose the rule to be followed in this jurisdiction on the matter.

Before proceeding further, let us examine briefly the two laws in conflict. At the time of the occurrence of the accident the legislation of the Virgin Islands limited to $10,000 the maximum amount recoverable as compensation for damages in cases such as that at bar. See 5 V.I.C. § 75, History. *Cf. Fleming* v. *Hagemann,* 1 V.I.R. 32 (1923); *Tebbs* v. *Alcoa Steamship Co.,* 3 V.I.R. 186 (1956); and *Tebbs* v. *Alcoa Steamship Co.,* 3 V.I.R. 592 (1957).[3] If such legislation were applicable to this case, we would be compelled to award to plaintiffs, if entitled to it, a compensation not exceeding $10,000 per person. (We need not elaborate in order to understand how unjust and arbitrary would be a limitation of that type in cases in which greater compensation were justified.) If, on the contrary, the local law applies, the compensation would be determined in accord-

---

[3] That legislation was subsequently repealed and at present there is no limit to the amount recoverable. See 5 V.I.C. § 76. *Cf. Williams* v. *Dowling,* 4 V.I.R. 465 (1963).

ance with the damages judicially established and evaluated, since in Puerto Rico there is no limitation similar to that which existed in the Virgin Islands. The Federal Act does not contain such limitation either.

We must concede at the outset of the discussion of the problem herein posed by the conflict of laws that the traditional rule favored the norm of *lex loci delicti*. Our Civil Code and its predecessor, the Spanish Code, are silent on the matter, but Spain has adhered to the aforesaid traditional rule. It is significant, however, that it has done so "considering precisely that the State of that place (where the wrongful act occurs) is the one having a manifest interest in that the prohibited act be not performed, or, if performed, that it may give rise to the corresponding juridical relations," as stated by Castán,[4] or because it is believed that "resort should be had to the dominant point of contact," as stated by Pérez and Alguer.[5] It must be observed at the start that the Spanish position is not whimsical, but is based on the fact that there should be applied the law of the State having greater interest in that the wrongful act be not committed, or, if committed, that due reparation be made; or otherwise stated, that the law of the State having the dominant contact be applied.

The American law has been prolific in the framing of theories on the matter. The following are accepted: (1) the "comity" theory launched by Story; (2) the "vested rights" theory, associated with Beale and Holmes; (3) the "local" law theory of Cook and Hand; (4) the theory, already quite generalized, of "grouping of contacts," also known by the names of "dominant contacts," "center of gravity," and "most significant relationship"; and (5) the theory called in English "governmental interests" of Currie. The latter

---

[4] I-1 *Derecho Civil Español, Común y Foral* 499 (10th ed. 1962).

[5] In his notes to the translation of I-1 Enneccerus, Kipp and Wolff, *Tratado de Derecho Civil* 277 (2d ed. 1953).

is similar to the "grouping of contacts" theory, and in Spanish it would have to be called by some other name since its emphasis lies on considerations of public policy and not merely bureaucratic.[6] We are not justified, we believe, in making here an explanation of the diverse schools or theories mentioned above, since that has already been done. See Cheatham, *"American Theories of Conflicts of Laws: Their Role and Utility,"* 58 Harv. L. Rev. 361 (1945); and for excellent discussions on contemporaneous trends, see the symposium *"New Trends in the Conflict of Laws"* in 28 Law & Contemp. Prob. 673 *et seq.* (1963), in which Professors Reese, Ehrenzweig, Leflar, Currie and others have collaborated.

The traditional position in the American law was also to follow the rule of *lex loci delicti.* It was so adopted in the first Restatement. See Restatement of the Law of Conflict of Laws (1934), §§ 378, 379, 383, 384, 391. See, also, Leflar, Conflict of Laws, § 110 (1959); Goodrich, *"Tort Obligations and the Conflict of Laws,"* 73 U. Pa. L. Rev. 19 (1924). Several advantages are recognized to this rule: (1) it affords uniform treatment of the matter; (2) it discourages more convenient forum shopping; (3) ease of application; and (4) produces certainty and simplicity of predictability.

Despite the advantages noted, that doctrine presents such serious substantial defects that the jurists have from the beginning directed their attacks against it and the courts started to find exceptions in order to prevent its unjust and blindfolded application. On the reaction of the authors, see, cited in chronological order, the following: Lorenzen, *"Territoriality, Public Policy and the Conflict of Laws,"* 33 Yale L.J. 736 (1924); Yntema, *"The Hornbook Method and the Conflict of Laws,"* 37 Yale L.J. 468 (1928); Lorenzen, *"Tort*

---

[6] The terms "state" and "government" and their derivatives do not have a pejorative connotation in the semantics of the Anglo-Saxon countries having more experience in self-government and used to see the state and the government as something of their own and not somebody else's.

*Liability and the Conflict of Laws,*" 47 L.Q. Rev. 483 (1931); Cook, *"Tort Liability and the Conflict of Laws,"* 35 Colum. L. Rev. 202 (1935); Rheinstein, *"The Place of Wrong: A Study in the Method of Case Law,"* 19 Tul. L. Rev. 4, 165 (1944); Cheatham, *"American Theories of Conflict of Laws: Their Role and Utility,"* 58 Harv. L. Rev. 361 (1945); Morris, *"The Proper Law of a Tort,"* 64 Harv. L. Rev. 881 (1951); Currie, *"Survival of Actions: Adjudication Versus Automation in the Conflict of Laws,"* 10 Stan. L. Rev. 205 (1958); Stumberg, *"The Place of the Wrong: Torts and the Conflict of Laws,"* 34 Wash. L. Rev. 388 (1959); Ehrenzweig, *"The Lex Fori-Basic Rule in the Conflict of Laws,"* 58 Mich. L. Rev. 637 (1960); Currie, *"Conflict, Crisis and Confusion in New York,"* 1963 Duke L.J. 1. We shall shortly take up the case law.

In contraposition to the above-enumerated "advantages" of the doctrine of *lex loci delicti,* the following criticisms are made: (1) it is characterized by its mechanical treatment of the cases; (2) it does not consider questions of public policy; (3) it considers important only one factor (the place of the wrong); and (4) it is a strict system which places ease and facility before justice. See the comments of Professors Cavers, Cheatham, Currie, Ehrenzweig, Leflar and Reese in 63 Colum. L. Rev. 1212–57 (1963); the Symposium *supra,* 28 Law & Contemp. Prob. 673 *et seq.*; Sherwood, *"Babcock v. Jackson: The Transition from the Lex Loci Delicti Rule to the Dominant Contacts Approach,"* 62 Mich. L. Rev. 1359 (1963); Hase, *"Babcock v. Jackson: A Possible Solution to Conflicts Confusion in Wisconsin,"* Vol. 1964 Wis. L. Rev., No. 2, p. 316; Note, *"Lex Loci Delicti Rejected in Torts Conflicts of Law,"* 25 Md. L. Rev. 238 (1965); Note, *"Conflicts of Laws—Torts—Repudiation of Place of Injury Rule,"* 17 Vand. L. Rev. 283 (1963); Note, *"Conflicts of Laws—Law of Place of Tort Abandoned in favor of 'Grouping of Contacts' Theory,"* 15 Syracuse L. Rev. 78 (1963);

Note, 38 Tul. L. Rev. 398 (1964); Cheatham, *"American Theories of Conflict of Laws: Their Role and Utility,"* 58 Harv. L. Rev. 361 (1945); Stumberg, *"The Place of the Wrong—Torts and the Conflict of Laws,"* 34 Wash. L. Rev. 388 (1959); Currie, *"On the Displacement of the Law of the Forum,"* 58 Colum. L. Rev. 964 (1958). The latter article appears also in Selected Essays on the Conflict of Laws (1963) of the same author.[7]

As stated above, the courts have refused in the past years to apply blindly the rigid doctrine of *lex loci delicti*. The development of the recent case law on the matter is the history of an ever-growing erosion of that rule. Let us examine briefly some specific cases.

In *Gordon* v. *Parker*, 83 F.Supp. 40 (1949), the question was whether the law of Massachusetts or that of Pennsylvania should be applied to an action of alienation of affections. The action was brought in Massachusetts against a resident of that state. The matrimonial domicile was Pennsylvania where the wrong occurred. In Pennsylvania that cause of action could not be maintained, but it could in Massachusetts. The court, after referring to the traditional doctrine, proceeded to analyze the interests of the respective states in the outcome of the action, and concluded that the interest of Massachusetts in discouraging that type of conduct outweighed the interest of Pennsylvania in refusing to maintain that action, and applied the law of the forum. Although it was not expressly stated, the decision was an implied repudiation of the doctrine of *lex loci delicti*.

In *Dale System* v. *Time*, 116 F.Supp. 527 (1953), it was an action for damages based on a libel published in various states. The court concluded that the law of the domicile of the injured plaintiff was controlling, and did not attempt

---

[7] The Annual Survey of American Law of 1964, at p. 69, considers this book by Professor Currie as the most important publication of the year on matter of conflict of laws.

to determine in what other states plaintiff had suffered injury nor which of their laws was controlling.

In *Grant* v. *McAuliffe*, 264 P.2d 944 (1953), the tort occurred in Arizona, but all the parties involved in the action were residents of California. The Supreme Court of California applied the law of that state. Apparently that court was not yet prepared to expressly repudiate the traditional doctrine, and in order to do so it resorted to the fiction that a problem of procedure was involved.[8]

*Schmidt* v. *Driscoll Hotel*, 82 N.W.2d 365 (1957), is a significant case in this history of repudiation of the blind application of the *lex loci delicti* doctrine. Notice should be taken of the similarity, not in the facts, but in the problem raised, to the case at bar.

. In *Schmidt* the only point of connection or contact of Wisconsin with the case was that the automobile accident in which plaintiff was injured occurred in that state. The parties were residents of Minnesota. Within the particular facts of the case, the Minnesota law provided a right of action to plaintiff which the Wisconsin law did not recognize. However, if the law of Wisconsin, the place of the tort, had been applied, plaintiff would have lost the right of action given him by the law of his state, Minnesota. The court said that the *lex loci delicti* doctrine should not be applied in a situation in which the result would have been at variance with the principles of equity and justice, and flatly declined to make a mechanical application of the aforesaid traditional rule.

---

[8] The writer of that opinion, the most eminent and respected Chief Justice of the Supreme Court of California, Roger J. Traynor, wrote later, and with his characteristic intellectual honesty, the following of his own opinion: "It may not be amiss to add that although the opinion in the case is my own, I do not regard it as ideally articulated, developed as it had to be against the brooding background of a petrified forest." 37 Texas L. Rev. 657, 670 (1959).

In *Haumschild* v. *Continental Casualty Co.*, 95 N.W.2d 814 (1959), the court held that the question of whether a spouse may sue the other should be decided in accordance with the law of the matrimonial domicile, and declined to apply the law of the state where the tort was committed. As it may be seen, the traditional rule was also repudiated in this case. The court recognized that the problem presented was considerably related to the public policy of the state where the spouses had their domicile. The court said at p. 818 that "it must be recognized that, in the field of the conflict of laws, absolutes should not be made the goal at the sacrifice of progress in furtherance of sound public policy."

The famous[9] case of *Kilberg* v. *Northeast Airlines*, 172 N.E.2d 526, decided in 1961 by the Court of Appeals of New York, undermined almost fatally the doctrine under discussion. This case bears much resemblance to the case at bar. The aviation accident occurred in Massachusetts where the statute limited to $15,000 the maximum compensation for damages. The victim was from New York and the case was heard there.

The New York court, without still expressly repudiating the old doctrine, did so as a matter of fact in holding that the $15,000 limit was not applicable. The court rationalized its decision by saying that the question was one of procedure, and, besides, that the law of Massachusetts was contrary to the public policy of the state of New York. New York did not have a limitation on the amount recoverable such as that of Massachusetts. In order to reach the result which it deemed fair, the court disregarded the case law which sustains that the amount of compensation for damages is substantive matter, *Western Union Tel. Co.* v. *Brown*, 234 U.S.

---

[9] 61 Colum. L. Rev. 1497 (1961); 46 Cornell L.Q. 637 (1961); 49 Geo. L.J. 768 (1961); 74 Harv. L. Rev. 1652 (1961); 15 Rutgers L. Rev. 620 (1961); 28 U. Chi. L. Rev. 733 (1961); 47 Va. L. Rev. 692 (1961).

542 (1914); *Northern Pac. R.R.* v. *Babcock*, 154 U.S. 190 (1894). It is interesting to note that New York subsequently repudiated the characterization of the limitation of amount as a procedural matter in *Davenport* v. *Webb*, 183 N.E.2d 902 (1962).

In *Pearson* v. *Northeast Airlines*, 309 F.2d 553 (1962), the Court of Appeals for the Second Circuit upheld the holding in *Kilberg, supra*. The court expressly said at p. 559 that a state with substantial ties to a transaction has a legitimate constitutional interest in the application of its own rules of law. Insisting on the constitutionality of the New York decision, the court said at p. 561 that New York had the right to weigh the importance of the contracts of the various states with the transaction and to apply its own law without interfering with the Constitution (full faith and credit clause), once it was convinced that its contacts were controlling.

The preceding analysis shows, we believe, how the doctrine of *lex loci delicti* kept losing force and prestige among the jurists and the courts. The case law from *Gordon, supra*, to *Pearson, supra*, shows an increasing impatience against the strictness of the doctrine. The courts have almost uniformly preferred to use the dominant contacts as the real basis for their decisions, although at times they rationalized their decisions so that apparently the latter remained within the background of the "petrified forest."[10]

---

[10] See the comments by Mr. Justice Traynor, footnote 8 of this opinion.

Persons trained on the study of the law on the basis of cases are able to perceive the difference that at times exists between what the opinions say and what they do. Years ago Mr. Justice Holmes noted the following: "The very considerations which judges most rarely mention . . . are the secret root from which the law draws all the juices of life. I mean, of course, considerations of what is expedient for the community concerned. Every important principle which is developed by litigation is in fact and at bottom the result of more or less definitely understood views of public policy." The Common Law, p. 35 (1946 ed.).

It was in *Babcock* v. *Jackson*, 191 N.E.2d 279 (1963), where the Court of Appeals of New York openly and impliedly repudiated the *lex loci delicti* doctrine on matter of damages, being the first court to do so on that matter.[11] Already that doctrine had been practically repudiated on matter of contracts, *Vanston* v. *Green*, 329 U.S. 156, 162 (1946), and the same court which decided *Babcock* had refused to apply it on that matter, *Auten* v. *Auten*, 124 N.E.2d 99 (1954). We did likewise in 1961 on matter of contracts and of insurance. See *Maryland Casualty Co.* v. *San Juan Racing Ass'n*, 83 P.R.R. 538.

*Babcock*, *supra*, bears great resemblance to the case at bar. In that case three persons, all residents of New York, left by car on a pleasure trip to Canada. They sustained an accident in Ontario and one of the injured passengers sued in New York the driver of the car. The Ontario law exempted the driver from liability, but the New York law did not. The question raised was that the law of the place of tort exempted defendant from civil liability.

The court said that the *lex loci delicti* rule was already discredited as being strict and unjust, labelled it anachronic and declined to apply it. In turn, it applied the law of New York which allowed recovery for damages caused through the driver's negligence. It based its decision on the dominant contacts doctrine. It reasoned that the parties involved were from New York; that that state owed them protection; that the public policy of New York is that damages caused through negligence must be compensated; and that the place of the accident was a fortuitous and irrelevant element for the justice of the case. The court pointed out that Ontario had an interest in the conduct of persons within its borders,

---

[11] Sherwood, *"Babcock* v. *Jackson: The Transition from the Lex Loci Delicti Rule to the Dominant Contacts Approach,"* 62 Mich. L. Rev. 1358, 1368 (1964).

so that Ontario could therefore enforce the traffic regulations on its highways. The difference is clear.

■ The preceding case law which we have analyzed is not binding upon us. *Jiménez y Salellas, Inc.* v. *Maryland Casualty Co.*, 92 P.R.R. 200 (1965); *Banchs* v. *Colón*, 89 P.R.R. 471 (1963); *Reyes* v. *Superior Court*, 84 P.R.R. 27, 29–30 (1961); *People* v. *Matos*, 83 P.R.R. 323, 328 (1961); *Belaval* v. *Sec. of the Treasury*, 83 P.R.R. 244, 248 (1961); *Cía. Azucarera* v. *Tax Court*, 72 P.R.R. 850, 861 (1951); *Corretjer* v. *District Court*, 72 P.R.R. 704, 710 (1951); *People* v. *Mantilla*, 71 P.R.R. 35, 48 (footnote 11) (1950); *Castro* v. *González, Warden*, 70 P.R.R. 846, 854 (1950); I Wigmore, Evidence 245, § 8a (3d ed. 1940). But we may find its reasonings valid.

From the foregoing analysis it will be clear that Puerto Rico, and not St. Thomas, has the dominant contacts with the case at bar. These are summed up in the third paragraph of this opinion. The plane, the corporation owning it, the four deceased passengers and their successors (plaintiffs herein) were or are, as the case may be, from Puerto Rico. It is to them that Puerto Rico owes the protection of its laws and of its public policy. The place of the accident is an entirely fortuitous factor, and the fortune of the parties, in a rational system of law, should not be left at the mercy of such a whimsical factor. We therefore adopt the doctrine of dominant contacts which in our opinion is more realistic and fair, and shall apply the law of Puerto Rico.[12]

■ The Supreme Court of the United States has no quibble with the doctrine which we have just announced. That Court has said that it does not conflict with the full-

_____

[12] "A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done. Concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity." Section 1802 *et seq.* of the Civil Code, 31 L.P.R.A. § 5141 *et seq.*

faith-and-credit and the due-process clauses. In *Clay* v. *Sun Insurance Office*, 377 U.S. 179 (1964), it found that Florida had ample contacts with the case to warrant the application of the law of Florida and not that of Illinois. The Supreme Court of the United States has not adopted any choice-of-law rule to be applied in these cases of conflict of laws, but has left to each state the making of its own law on conflict of laws. It is to be assumed that the states will do so within a strict sense of justice and equity. Leflar, *"Constitutional Limits on Free Choice of Law,"* 28 Law & Contemp. Prob. 706, 730 (1963); 1964 Annual Survey of American Law 89.

■ As it may be assumed, after examining the trend of the American Law on this matter, the Restatement proposes to abandon its old position and to adopt the doctrine of dominant contacts. Thus, in announcing the new general principle proposed, it adopts the same completely.[13] The Uniform Code of Commerce also adopts the new doctrine, save agreement to the contrary. Uniform Commercial Code (U.L.A.), § 1–105; 63 Colum. L. Rev. 1232 (1963); 38 Tul. L. Rev. 399 (1964).

The new trend in the field of damages evinced by this case and by *Babcock, supra,* is but a phenomenon of the American law. It may be said that the effort to make of the law a science at the service of man and of his best ideals and aspirations is universal. For an excellent discussion of the matter in relation to this same question of damages, see Chapter 2, *"Tort and Insurance,"* by Friedmann, "Law in a Changing Society" (1959).[14] Similar orientations also come

---

[13] "The local law of the state which has the most significant relationship with the occurrence and with the parties determines their rights and liabilities in tort." Restatement Second, Conflict of Laws (Tentative Draft No. 9), 1964, § 379(1).

[14] Pound wrote an article on this book and in the last paragraph he said of the book: "This book does for the law of the predawn of the twenty-first century what Dicey's Law and Public Opinion in England in the Nineteenth Century did for Anglo-American law of the twentieth

to us from the Spanish modern civil lawyers. In explaining that the case law keeps pace with the sociological or cultural evolution of our times, and commenting specifically on such change in relation to the field of damages, Professor Diez-Picazo writes:

"At bottom, however, underneath the doctrinal foundation, there is perhaps beating an intuitive preoccupation which, in my opinion, is the ultimate root of the new Law of torts: the social need for defending and protecting the person against an unbridled industrial mechanization for the benefit of specified parties in the community and, only indirectly, for the community itself."[15]

■ As it may be seen, in adopting the doctrine of dominant contacts on matter of conflict of laws in cases of damages, we have taken care of a problem which in law is as ancient as the law itself. This is the problem of the need for the law to provide security and certainty and at the same time that it preserve the capacity to evolve with the times and to adapt itself to the new human realities. This evolution is necessary in order that the law, in each era and place, be just. Law is the art and science to serve man and not a trap to immobilize him.

This problem created by the necessity that there be security in the law, on the one hand, and of its growing development in the quest for justice, on the other, has been the object of concern on the part of philosophers and jurists since the pre-Christian ancient times.[16] Among the moderns, the assertion by Pound is already classical: "Law must be

---

century. We thought, when I entered teaching as my life work in 1907, that he had taught us the path of the law. But it was the path of the past. Now, I feel assured, we have been clearly shown the path of the century to come." 46 Minn. L. Rev. 117, 141 (1962).

[15] *"Reflexiones sobre la Jurisprudencia del Tribunal Supremo," Revista de Derecho Privado* 929 (Nov. 1964).

[16] *Cf.* our discussion on the equity in *Silva* v. *Industrial Commission,* 91 P.R.R. 865 (1965). See Cairns, Legal Philosophy from Plato to Hegel (1949).

stable and yet it cannot stand still. Hence all thinking about law has struggled to reconcile the conflicting demands of the need of stability and of the need of change."[17] Castán has expressed it as follows: "The Law has, at the same time, two needs difficult to reconcile: On the one hand, it demands security and certainty, and on the other, mobility and possibilities of adaptation to the changing reality." *Teoría de la Aplicación e Investigación del Derecho* 356 (1947). See the same matter treated in The Formative Era of American Law 13 (1938), and in Law Finding Through Experience and Reason 23 (1960), both books by Pound. By Stone, Julius, see Human Law and Human Justice 241 *et seq.* (1965), and also by the same author, Legal System and Lawyers' Reasonings 323 (1964). With his customary clarity, Friedmann treats it in Legal Theory 32 (4th ed. 1960), and in Law in a Changing Society 31 (1959). Allen discusses it in Law in the Making 290 *et seq.* (3d ed. 1939). The problem under discussion could hardly be treated with greater literary lucidity than as was done by Cardozo in his essays Nature of the Judicial Process (1921) and Paradoxes of Legal Science (1928).[18]

Naturally, the perennnial conflict raised by the need of stability and change in the law will not be permanently decided in our times. The law, as a live social science, em-

---

[17] "Law must be stable and yet it cannot stand still. Hence all thinking about law has struggled to reconcile the conflicting demands of the need of stability and of the need of change." Interpretations of Legal History 1 (1923). Translated into Spanish by Puig Brutau under the name of *Las Grandes Tendencias del Pensamiento Jurídico* (1950).

[18] Regarding this attitude of delving into the law in order to extract its substance, the following two comments are characteristic of their authors:

Of Holmes, "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV." *"The Path of the Law,"* Collected Legal Papers 187 (1920).

Of Llewellyn, "For a mere legal machine is a social danger. Indeed, a mere legal machine is not even a good lawyer. It lacks insight and judgment." The Bramble Bush 101 (1951 ed.).

bodies within itself the above-mentioned antithesis. It is for each generation to achieve and maintain the necessary balance between those two forces in order that the law may operate with reasonable efficacy.

## III

■ There remains for us to consider whether or not the doctrine of res ipsa loquitur is applicable to this case. We do not find it necessary to make here an explanation of that doctrine. Recently we have considered the same carefully, *Community Partnership* v. *Presbyterian Hospital*, 88 P.R.R. 379 (1963); *Ramos* v. *Water Resources Authority*, 86 P.R.R. 572 (1962); and its meaning and history have been clearly explained in the textbooks. Prosser, The Law of Torts 215–39 (3d ed. 1964); 2 Harper & James, The Law of Torts 1075–1107 (1956). For conflicting views, see Prosser, *"Res Ipsa Loquitur in California,"* 37 Calif. L. Rev. 183 (1949); Seavey, *"Res Ipsa Loquitur: Tabula in Naufragio,"* 63 Harv. L. Rev. 643 (1950); Jaffe, *"Res Ipsa Loquitur Vindicated,"* 1 Buffalo L. Rev. 1 (1951).

Said the court in *Haasman* v. *Pacific Alaska Air Express, Inc.*, 100 F.Supp. 1, 2 (1951): "The question presented, therefore, is whether the doctrine of res ipsa loquitur applies where the plane disappears during flight without a trace." The situation in the case at bar is the same. In *Haasman, supra*, as here, the weather was good, the plane was not found, and the cause of the accident was not known. The court concluded that that doctrine was applicable to the case.

In the first aviation accident cases the courts did not apply the doctrine of res ipsa loquitur. It was then reasoned that aviation was not sufficiently developed nor was sufficiently safe to apply the doctrine to aviation accidents not

otherwise explained.[19] That jurisprudential situation has changed diametrically. Owing to the technological progress in aviation, and undoubtedly owing also to the social justice and convenience of leaving the economic loss on the party more capable to absorb it, Prosser, *op. cit.* at p. 22; Diez Picazo, article *supra* at p. 929, the case law has for years since uniformly applied the doctrine to this class of accidents. *United States* v. *Kesinger*, 190 F.2d 529 (1951); *Rogow* v. *United States*, 173 F.Supp. 547 (1959); *Lobel* v. *American Airlines*, 192 F.2d 217 (1951), *cert. denied*, 342 U.S. 945 (1952); *Smith* v. *Pacific Alaska Airways*, 89 F.2d 253 (1937), *cert. denied*, 302 U.S. 700 (1937); *Capital Airlines* v. *Barger*, 341 S.W.2d 579 (1960); *Northwest Airlines* v. *Rowe*, 226 F.2d 365 (1955); *Kamienski* v. *Bluebird Air Service*, 53 N.E.2d 131 (1944), *aff'd*, 59 N.E.2d 853 (1944): Annotation, *"Res Ipsa Loquitur in Aviation Cases,"* 6 A.L.R.2d 528, 529. Kreindler in 1 Aviation Accident Law 103 (1963), says "It is perfectly clear that *res ipsa loquitur* applies in aviation accidents." The same author also writes, in the same book at p. 177, that "There is no reason why *res ipsa loquitur* should not apply to private aircraft cases."

When the cause of the accident can be explained, the liability situation may, indeed, be otherwise. Prosser, *op. cit.* at p. 221.

Defendants' argument that the plane in the case at bar had dual controls cannot vary the result. There is not the least scintilla of evidence that the passenger who was seated beside the pilot—Mr. Fornaris—attempted to pilot the plane. On the contrary, there is evidence in the record that that passenger was not fond of piloting planes and

---

[19] *Wilson* v. *Colonial Air Transport*, 180 N.E. 212 (1932); *Herndon* v. *Gregory*, 81 S.W.2d 849 (1935); *Morrison* v. *Le Tourneau*, 138 F.2d 339 (1943); *Smith* v. *Whitley*, 27 S.E.2d 442 (1943); *Towle* v. *Phillips*, 172 S.W.2d 806 (1943).

that he was not interested in that sport. Of course, there is a *mathematical possibility* that Fornaris would have piloted, but that, in view of the evidence, is not the *probability*. The law deals with probabilities, not with possibilities. Hypothetical possibilities are practically infinite. The existence of dual controls does not per se necessarily leave plaintiffs defenseless. See *Drahmann* v. *Brink*, 290 S.W.2d 449 (1956) ; *Boise* v. *Larsen*, 214 F.2d 373 (1954).

We therefore conclude that the law of the forum and the doctrine of res ipsa loquitur are applicable. We find no reversible errors. As to appellants' appeal from the award of attorney's fees, we do not believe that the trial judge abused his discretion and, therefore, we shall not reverse his determination either. The judgment rendered in this case by the Superior Court, San Juan Part, on August 27, 1963, as modified by that court on November 20, 1963, will be affirmed.

