131 N.J. Super. 371 (1974)
330 A.2d 38
ANTHONY BARRES, PLAINTIFF,
v.
HOLT, RINEHART AND WINSTON, INC., A CORPORATION OF THE STATE OF NEW YORK AND RON PORAMBO, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided November 18, 1974.
*373 Barry H. Evenchick for plaintiff (Schapira, Steiner & Walder, attorneys).
David S. Litwin for defendant Holt, Rinehart and Winston, Inc. (Pitney, Hardin & Kipp, attorneys).
*374 DWYER, J.S.C.
Before filing an answer defendant Holt, Rinehart and Winston, Inc. (publisher) moved to dismiss the complaint of Anthony Barres filed on May 31, 1974, charging publisher and Ron Porambo (author) with libel based on certain statements made about Barres in the book, No Cause For Indictment. The motion was made on the grounds that court lacked subject matter jurisdiction[1] and the complaint failed to state a cause of action in that the accompanying affidavit of publisher's officer showed that the book was released in accordance with general trade practices on November 15, 1971, and hence any cause of action was barred on November 16, 1972, citing N.J.S.A. 2A:14-3 (one-year period of limitation for libel). Alternatively, publisher moved for summary judgment.
Barres contended that no dates were set forth in the complaint; hence, the defense of statute of limitation could not be raised by motion. He further contended that each sale of the allegedly libelous book gave rise to a new cause of action; hence, the fact that there had been a general release of the book on November 15, 1971 should not result in a holding that all claims were barred by the one-year statute of limitation.
This motion presented a question of novel impression for decision under New Jersey law, namely, when does the period of limitation commence to run on a libelous statement made in a book distributed in many states on a general release date where the publisher thereafter sells copies of such book for several years.
There are two rules. The older rule is that each repetition of a libel, in this case sale of the book, creates a new cause of action  the multiple publication rule. However, in recent years the American courts have held that *375 where an issue of a newspaper, magazine or edition of a book contains a libelous statement, plaintiff has a single cause of action and the number of copies distributed is considered as relevant for damages but not as a basis for a new cause of action  the single publication rule. See Prosser, Torts (4 ed. 1971), § 113.
Since Barres had had no opportunity for discovery, the court treated the matter as one for summary judgment, R. 4:6-2, and allowed plaintiff to take the deposition of the affiant and examine the records of publisher. See Community Development Co., Inc. v. Seaside Gardens, Inc., 7 N.J. 153 (1951); cf. Rappeport v. Flitcroft, 90 N.J. Super. 578 (App. Div. 1966). The deposition was taken and supplemental briefs were submitted. Counsel did not refer the court to, and the court has not found, any New Jersey case that has decided which of the aforementioned rules should apply.
The following are uncontroverted facts. Author wrote the manuscript for No Cause For Indictment based upon events and persons involved in the community life of the City of Newark in the period preceding and following the riot in 1967. Barres was and is a resident of Newark and still is active in the Newark Police Department. He is chief of police and has served as acting director of police.
Publisher acquired certain rights to the manuscript from Author through his New York literary agent. Publisher, a nationally known publishing house, is a New York corporation with offices in New York. It maintains warehouses for distribution in several states, including one in Clifton, New Jersey, and it has a registered agent in New Jersey.
In the late summer of 1971 publisher prepared the manuscript for printing. Based on business judgment, publisher placed an order with a third-party printer in Massachusetts for the printing of 6,000 copies. It later placed an order with a corporation related to the printer and located in Massachusetts for the binding of said 6,000 copies in hard cover.
*376 By October 19, 1971 publisher knew that the books would be ready for distribution. It accordingly sent copies to reviewers and buyers for book outlets, listed the book in its fall catalog, and arranged for newspaper advertising in the Bergen Record and the Newark Star-Ledger in November and December 1971.
Pursuant to established trade practice, publisher released the book to the trade and to book stores on November 15, 1971. It also filled all prerelease date orders on that date. By December 31, 1971 publisher had sold 3,773 hard cover copies and had also distributed several hundred copies to reviewers. Publisher on January 21, 1972 advertised the book in the New York Times. Sales of the aforesaid 3,773 copies were regarded as good. In February 1972 publisher placed an order with the same printer and binder for an additional 2,500 hard cover copies.
However, sales of the hard cover copy slackened. In July 1972 publisher ordered hard covers removed from 2,500 copies and paper covers substituted. There is nothing in the record to indicate that there was any general announcement or release to the trade or public concerning the paperback edition.
Beginning in July 1972 Publisher had 2,500 paper cover copies. It sold 454 in 1972, 306 in 1973 and 243 to September 1974 and, after distributing copies to reviewers, bookstore employees and others, presumably has about 1,373 paperback copies currently remaining. It fills requests for the book from this stock.
In respect to the hard cover copies, publisher received back 186 more copies than it sold in 1972. In August 1973 it sold approximately all of its inventory, totaling 1,857 copies, to a remainder outlet at less than 50 cents a copy. The invoice for this transaction indicates that it was part of a disposition of several titles that were not then moving. The sale was final. The remainder outlet sells by mail as well as through a few specially selected retail outlets. Publisher has no information concerning the remainder outlet's disposition *377 of these 1,857 books. Publisher has no more hard cover copies.
There is no question that Barres had a cause of action on November 15, 1971 when publisher released the book, assuming for the purposes of this motion that the statement was libelous. See Johnson v. Asbury Park Press, Inc., 14 N.J. Misc. 282 (Sup. Ct. 1936), aff'd 117 N.J.L. 533 (E. & A. 1973).[2] In that case plaintiff moved to strike the defense that the one-year period of limitation for libel enacted by the Legislature on April 30, 1934, L. 1934, c. 98, barred the complaint filed February 25, 1936. The libel was published March 7, 1934 when there was no express statutory period of limitation for libel. The court rejected the argument *378 based on constitutional grounds that the one-year period of limitation could not be applied retroactively. It held that the cause of action arose when the alleged libelous article appeared in the issue of the Asbury Park Press of March 7, 1934, and plaintiff, therefore, had ten months to sue before the new general rule prevented suit. See also, Zuck v. Interstate Publishing Corp., 317 F.2d 727 (2 Cir.1963), where, after determining that only New York or New Jersey law could apply, the court held that under New York law the period of limitation commenced to run from the date a magazine was delivered for sale to the public, and said that in the absence of any New Jersey decisions, the period of limitations under N.J.S.A. 2A:14-3 did not commence to run at any date earlier than the date of sale to the public.
In New York, as in most other jurisdictions, the statute of limitations for libel actions is unusually short. To fix as the date of legal publication even the time that the offending matter is placed on sale to the public may create a trap for unwary plaintiffs; magazines are often post-dated several weeks or months after the actual date they are placed on sale to the public. To fix the accrual date prior to receipt by the public of the libelous material, however, is normally to begin the running of the statute of limitations before the time that the offending publication has been brought to the victim's attention, and, indeed, prior to the occurrence of any harm to his reputation. The result, thus, is an effective shortening of an already short limitation period. Moreover, under the single publication rule, victims of mass publication libel are given but one action in which to recover for all harm produced by a single edition of a newspaper, magazine, or book. The earlier that sole cause of action must be commenced, the greater the likelihood of post-judgment distributions of the offending material for which the victim is denied any relief whatever. [at 731]
The question, then, is what is the nature of the right that Barres had on November 15, 1971.
In Duke of Brunswick v. Harmer, 14 Q.B. 185, 177 Eng. Rep. 75 (1849), the court held that plaintiff was not barred by statute of limitations in bringing an action for libel based on defendant's sale of a single copy of newspaper printed in 1830 when the sale occurred in 1847. Each sale *379 of the newspaper created a new cause of action, and each repetition of a libel or slander to a person other than the person defamed damages the reputation of plaintiff and gives rise to a new cause of action. See Restatement, Torts, § 577 (1938); 1 Harper and James, Law of Torts, § 5.16 (1956).
Applying that rule to the facts of this case, Barres would have a cause of action based on each sale that occurred in the year preceding the filing of the complaint on May 31, 1974, i.e., from June 1, 1973. What disposition would be made in respect to sales made after the complaint was filed? What, if any, consideration should be given to the sales on and before May 30, 1973? What Law is to apply to the sales made in foreign states? The attempt to solve such problems led to the development of the single publication rule. See Harper and James, supra, and Prosser, supra, where the author of the latter states:
* * * The majority of the American courts, however, have developed, in cases involving venue or the statute of limitations, a "single publication [" ed.] rule, under which an entire edition of a newspaper, magazine or book is treated as only one publication, and the plaintiff is permitted to plead and prove merely a general distribution of the libel and show the extent of the circulation as evidence bearing on the damages. Under this rule the publication has been treated as complete when "the finished product was released by the publisher for sale in accord with trade practice." * * * [Prosser, op. cit. at 769]
The decisions developing the single publication rule suggest the following reasons for its development: To prevent the constant tolling of the statute of limitations and thereby support the legislative determination for a short period of limitation of libel, Wolfson v. Syracuse Newspapers, Inc., 254 App. Div. 211, 4 N.Y.S.2d 640 (App. Div. 1938), aff'd per curiam with a strong dissent, 279 N.Y. 716, 18 N.E.2d 676 (Ct. App. 1939); Gregoire v. G.P. Putnam's Sons, 298 N.Y. 119, 81 N.E.2d 45 (Ct. App. 1948); convenience to the parties and courts in consolidating into one action all the damage to plaintiff, Wolfson, supra; Gregoire, supra, and Zuck, supra; also Ogden v. Ass'n of United States Army, 177 F. Supp. 498 (D.C.D.C. 1959).
*380 In Gregoire v. G.P. Putnam's, supra, plaintiff instituted suit on July 2, 1946 against the author and publisher of a book containing an alleged libelous statement. The publisher commenced distribution of the book in November 1941 and thereafter made seven additional printings of the same edition, the last in December 1943. After 1943 all sales were from stock. In the year preceding the filing of the complaint 20 copies were sold in the United States.
The matter for decision by the Court of Appeals concerned the following question certified by the Appellate Division:
* * * Do sales from stock by a book publisher of copies of a book containing libelous material constitute republications of the libelous matter, so as to give rise to new causes of action within the meaning of Section 51, subdivision 3, of the Civil Practice Act, where the copies sold are from an impression made and released for wholesale distribution more than one year prior to the dates of such sales?
The Court of Appeals was divided four to three. The majority adopted the single publication rule and said in its opinion:
The rule of Duke of Brunswick v. Harmer, supra  that each delivery to a third person of a defamatory article constituted a new publication of the libel, which in turn gave rise to a new cause of action  had its origin in an era which long antedated the modern process of mass publication and nationwide distribution of printed information. That rule also gave scant heed to the public policy which underlies statutes of limitation, long regarded as "statutes of repose" designed to outlaw stale claims. * * * [81 N.E.2d at 46-47; citations omitted]
The court noted that the Appellate Division, in certifying the question, had indicated a different rule should apply to books than to newspapers and magazines. The court stated that if there was a cause of action for libel, that cause was subject to the same period of limitation whether in a newspaper, magazine or book since the technology for printing and distribution was the same. It concluded:
*381 * * * Otherwise, although a book containing libelous material may have been the product of but one edition or printing fifty years ago, if, by sale from stock or by display, the publisher continues to make unsold copies of the single publication available to the public today, such conduct would amount to a republication of any libel the book contains and thereby would become actionable. Under such a rule the Statute of Limitation would never expire so long as a copy of such book remained in stock and is made by the publisher the subject of a sale or inspection by the public.

* * * * * * * *
Although it may not be said that the publication and dissemination of books has reached that degree of mass production and widespread distribution now prevalent in fields invaded by newspapers and periodicals, it is our view that the publication of a libelous book, involving styling, printing, binding and those other acts which enable a publisher on a given date to release to the public thousands of copies of a single printing or impression, affords the one libeled a legal basis for only one cause of action which arises when the finished product is released by the publisher for sale in accord with trade practice. [at 48-49; emphasis supplied]
In his dissenting opinion, Judge Desmond said:
* * * Since nothing is so dead as last week's newspapers, it is not unreasonable to hold that nothing that afterwards is done with them can be deemed a "publication" in law. But a book's existence is not intended to be, and is not, for any such brief time. The book publisher keeps his stock on his shelves and sends out books as called for. When, a year or two or ten years after first printing, he deliberately puts out new copies of the defamatory writing, how can it be said that he is not, in fact and in law, republishing the libel? And, since the common law is plain and just, and the statute certainly has not changed it, why should we extend to the whole field of books an exception appropriate to periodicals only?

* * * * * * * *
* * * The producer of libelous matter can start the statute running in his favor at anytime by refraining from sending out any more libeling books. The Statute of Limitations is intended as a statute of repose but it is not intended to furnish a license for continued wrongdoing. [81 N.E.2d at 50-51]
In Ogden v. Ass'n of United States Army, supra, plaintiff on June 25, 1959 sued defendant for alleged libelous statements contained in a book written by defendant and published in November 1955. Defendant moved for summary judgment on the ground that if the single publication rule *382 were applied to determine when the cause of action accrued, the action was barred under the one-year statute of limitation for libel in the District of Columbia. Noting that the issue presented was one of novel impression, Judge Holtzhoff examined the cases concerning newspapers and magazines which developed the single publication rule, and referred to the decision in Gregoire v. G.P. Putnam's Sons, supra. He also noted that only a minority of states adhered to the English rule exemplified in Duke of Brunswick v. Harmer, supra. The opinion stated:
* * * Books attain a distribution far beyond that likely a hundred years ago. Mass production has entered the printing and publishing field. To say that every sale or delivery of a copy of a publication if it contains defamatory matter, gives rise to a new cause of action may seem logical from a purely technical standpoint, but to adhere to this doctrine would be to sacrifice reality to strict technical logic. Under modern conditions the original common-law rule would give rise to an unnecessary multiplicity of suits and would practically destroy the statute of limitations as a statute of repose in actions for libel. [177 F. Supp. at 500]
That the cause of action that exists on the general release date embraces not only the copies then sent out but all copies that are associated with that date, including those to be released in the future, i.e., all claims related to that issue or edition, is made clear in Zuck v. Interstate Publishing Corp., supra:
New York's single publication rule as laid down in Wolfson and Gregoire v. G.P. Putnam's Sons, supra, however, constitutes no mere modification of agency principles in New York jurisprudence. In both cases the application of the rule was held to cut off or "to engross" causes of action for distributions made by the publisher itself after the date of original "publication." To fix the time of delivery to independent distributors as the time of legal publication under the rule, therefore, would be to burden the rule with a conceptual scheme foreign to its rationale.
We hold that under the New York single publication rule appellant's cause of action accrued no earlier than December 22, 1960, the date on which the March 1961 issue of "Movie World" went on sale to the public at newsstands throughout the United States. [317 F.2d at 733]
*383 The courts have held that where there has been a separate edition, or continued massive printing and distribution, after the general release date, there is a cause of action based on the later edition or republication.
In Wheeler v. Dell Publishing Co., 300 F.2d 372 (7 Cir.1962), the widow and minor daughter of man shot by police officer appealed from a judgment of dismissal of a libel complaint in favor of the author and publisher of Anatomy of a Murder, entered on grounds that the action was barred by one-year statute of limitation of Illinois under the single publication rule. The book was published in June 1957. In April 1959 the publisher printed the "best seller" in a paperback edition and thereafter made several reprintings of the paperback edition. The Circuit Court of Appeals reversed as to the holding based on the statute of limitations. It said:
There is no need to attempt to distinguish between a reprinting and an edition. The significant factor in deciding against Dell's contention is the repeating of the defamation. It makes little essential difference to a defamed person whether the material is a new paperbound edition of an original publication or a new printing of the paperbound, if the defamation is repeated. What matters is the new wound to reputation by the new defamation. A libel is a written slander. Just as each repetition of the slander is actionable, so saying it again in writing is actionable.
The reprintings were not "miscellaneous copies" of the original printing, but were the result of a "conscious act." Winrod v. Time, Inc., 334 Ill. App. 59, 78 N.E.2d 708 (1948). The "leading" case of Gregoire v. G.P. Putnam's Sons, 298 N.Y. 119, 81 N.E.2d 45 (1948) is not controlling in Dell's favor. There, suit was based on a single copy of a book sold a year after first publication. A divided court dismissed the suit. The single book was part of the first printing and is well within the "miscellaneous copies" rule. Single books and miscellaneous copies are part of the original publication. There is no new conscious act. They are like echoes of spoken defamation. [at 373]
In Mack, Miller Candle Co. v. MacMillan Co., 239 App. Div. 738, 269 N.Y.S. 33 (App. Div. 1932), aff'd 266 N.Y. 489, 195 N.E. 167 (Ct. App. 1934), the court held that where book originally published in 1927 was continuously reprinted and distributed through 1931, the then two-year *384 period of limitations of New York had not run when the complaint was filed in 1932. The majority opinion in Gregoire v. G.P. Putnam's Sons, supra, distinguished this case from the single publication rule on the ground that there was republication. See Dodd v. Harper & Brothers, 3 A.D.2d 548, 162 N.Y.S.2d 419 (App. Div. 1957) (distribution of 25,000 copies of magazine article reprint considered separate publication from single publication of magazine, but single publication in itself to which one year period of limitation might apply).
Reference to the concept of "no new conscious act" in the quotation from Wheeler, supra, is found in Winrod v. Time, Inc., 334 Ill. App. 59, 78 N.E.2d 708 (App. Ct. 1948), which held that the sending of copies of magazines to replace those damaged in the mail, to start new subscriptions or to fill special requests, should be treated as "passive" acts within the meaning of the decision in Wolfson v. Syracuse Newspapers, Inc., supra, which had taken the expression from Seelman, The Law of Libel and Slander in New York (1933). The decision in Winrod v. Time, Inc., supra, quoted the following from Seelman:
"The test of whether the article is a republication or a repetition should not depend on an interval of time, or a separate sale but upon the answer to the question. Was the act of the defendant a conscious independent one? The individual who sends the same letter to different persons at the same or another time, consciously and intentionally and independently does so. Each separate mailing is a separate conscious act. Each would then be provable as showing conscious intent. Whereas, in the case of a newspaper, as the circulation is considered one of the chief items of damage, and plaintiff recovers for all the distribution, no conscious intent arises until the defendant consciously as a second edition republishes the article. In each case it is the conscious act which determines. If these simple rules are followed, the plaintiff will be compelled, as he should, to litigate in one action all his claims for damage arising from all libelous publications of the defendant, up to and including the trial, (except libelous publications of a different character arising after the action has been commenced); and the question of malice or intent from repetition of the libel can be submitted to the jury, as it should be, upon the conscious act of republication by the defendant."
*385 It thus appears that the majority in the Wolfson case supported their conclusion and reasoning on the theory enunciated in Seelman that only where there is a new edition or reprinting of a certain issue of a newspaper or magazine the conscious intent of the defendant to republish the libel becomes effective. [78 N.E.2d at 713]
The decisions after Winrod v. Time, Inc., supra, and the commentary to the Restatement, Torts 2d, Tentative Draft No. 20, § 577A (April 24, 1974), have not used the expressions "passive" and "conscious" acts but have stated the concept of a single publication in terms suggesting production runs that are related to the general release date.
The authors of Restatement, Torts 2d, Tentative Draft No. 20, § 577A, supra, have suggested the following addition to the Restatement:

* * * *
(3) Any one edition of a book or newspaper, or any one radio or television broadcast, exhibition of a motion picture, or similar aggregate communication, is a single publication.
(4) As to any single publication,
(a) only one action for damages can be maintained;
(b) all damages suffered in all jurisdictions can be recovered in the one action; and
(c) a judgment for or against the plaintiff upon the substantive merits of any action for damages bars any other action for damages between the same parties in all jurisdictions.

* * * *
Comment on Subsection (3):
c. The single publication rule applies also to the issue of any one edition of a newspaper, magazine or book; to any one broadcast over radio or television; to any one exhibition of a motion picture; to any one theatrical performance or other presentation to an audience; and to any similar aggregate communication which reaches a large number of persons at the same time. The rule is justified by the necessity of protecting defendants and the courts from the numerous suits which might be brought for the same words if each person reached by such a large-scale communication could serve as the foundation for a new action. The necessity becomes obvious when it is realized that there are today magazines whose circulation approaches four million, and that a television broadcast may be seen by as many as ten million people.
d. So far as the cases heretofore decided indicate, the single publication rule stated in Subsection (3) does not include separate aggregate publications on different occasions. Thus if the same defamatory *386 statement is published in the morning and evening editions of a newspaper, each edition is a separate single publication, and there are two causes of action. The same is true of a rebroadcast of the defamation over radio or television, or a second run of a motion picture on the same evening. In these cases the publication reaches a new group, and the repetition justifies a new cause of action. The justification for this conclusion usually offered is that in these cases the second publication is intended to and does reach a new group.
At the same time, the single publication rule is obviously to be administered to accomplish its purpose of avoiding multiplicity of suits, as well as harassment of defendants, and possible hardship upon the plaintiff himself. The examples given in Subsection (3) are not in any sense intended as limitations. The printing and distribution of extra copies of the first edition of a book may properly be treated as mere continued circulation of the first edition, and hence as still part of the single publication, if it is done not long after the original publication as soon as the supply is exhausted. If it occurs ten years later, it is indistinguishable from a second edition, and there is a new cause of action.
The conference of Commissioners on the Uniform Laws has also prepared a statute based on the single publication rule.[3] The Uniform Single Publication Act, 9C U.L.A. at p. 173, states in relevant part:
§ 1. No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one edition of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions.
§ 2. A judgment in any jurisdiction for or against the plaintiff upon the substantive merits of any action for damages founded upon a single publication or exhibition or utterance as described in Section 1 shall bar any other action for damages by the same plaintiff against the same defendant founded upon the same publication or exhibition or utterance.
Under the principles outlined in the abovementioned decisions, on November 15, 1971 Barres had a right to institute *387 an action for libel to recover damages to his reputation which would encompass, or "engross," all action taken by publisher and author up to the date of filing of the complaint and thereafter based on the printings up to the date the action was commenced.
The cases concerning books which the court has found and examined give no consideration to the facts posed by the present case, i.e., a stockpile of books totaling 1,373 which are selling at the rate of about 300 a year. In Gregoire v. G.P. Putnam's Sons, supra, the quantity of the stockpile is not disclosed but the sales from seven printings between 1941 and 1943 were at a level of 20 copies a year in the year preceding filing of the complaint. The commentators suggesting the provisions for Restatement, Torts 2d, § 577A, supra, indicate that the printing of extra copies close to the first printing and general release date should be treated as part of the cause of action based on the first publication. The decision in Wheeler v. Dell Publishing Co., supra, is based on a paperback edition printed two years after the general release at a time when a first-run feature movie with the same title was being released across the nation. The court treated this as a republication because the reprintings were not simply "miscellaneous copies" of the original printing.
On these facts, the application of the single publication rule to bar Barres from an action to recover damages from libel leaves publisher free to sell what may, or may not, be libelous material. Indeed, in all situations where the publisher of a book has a quantity on hand, a rigid application of the single publication rule will permit him to continue to sell material which may be libelous, particularly where as in the case at bar plaintiff cannot learn of the stockpile until discovery is had.
The reasons underlying the single publication rule are consistent with present public policy in New Jersey, such as the Legislature's determination for a short period of limitation N.J.S.A. 2A:14-3 (one year for libel) and *388 the provisions in the New Jersey courts permitting plaintiff to join all causes of action against a defendant in one action. R. 4:27-1.
Nevertheless, some courts recently have refused to adopt the single publication rule because of dangers which they see in it. In Lewis v. Reader's Digest Ass'n, Inc., Mont., 512 P.2d 702 (1973), pursuant to procedure provided in the rules of the Supreme Court of Montana, that court, in answering a question certified by the United States District Court for Montana hearing a diversity case,[4] adopted the multiple publication rule. There individual and corporate plaintiffs were residents of Montana engaged in running a "health mine." In August 1969 Good Housekeeping printed an allegedly libelous article critical of the "health mine" and mailed the issue to Montana subscribers. In January 1970 Reader's Digest Association printed a condensed version and sent it to subscribers in Montana totaling one-half the families in the state. Defendants were foreign corporations which were not registered to do business and which had no offices or property in Montana. The magazines were printed in other states.
The Supreme Court of Montana said:
* * * Generally in cases of multi-state libel, the greatest harm to a person's reputation will occur in the state of domicile. To promote *389 the underlying purpose of libel laws some courts have seen fit to apply the law of the plaintiff's domicile. This is a better rule than that which would restrict the plaintiff to the place of printing. Dale System, Inc. v. Time, Inc., D.C., 116 F. Supp. 527; Fouts v. Faweett Publications, D.C., 116 F. Supp. 535; Hazlitt v. Faweett Publications, D.C., 116 F. Supp. 538. This rule has the positive effect of restricting forum shopping by the plaintiff cited as a problem with multi-publication rule. In addition, it would prevent the publishing company from choosing as a place of printing a state with favorable libel laws. [at 705]
The court also noted that under the single publication rule some courts have suspected that an unscrupulous publisher might make a small distribution at a remote place from a person's domicile to start the period of limitations running and then make a massive distribution later. The person libeled might not sue at the time of the initial publication because of cost and limited damage, and then find himself barred when the massive distribution occurred. These are factors to be considered.
In recent years the Supreme Court of New Jersey has given a broad interpretation to R. 4:4-1 et seq. to establish jurisdiction in the courts of New Jersey. See Avdel Corporation v. Mecure, 58 N.J. 264 (1971), which states:
Our long-arm rule, unlike statutes in some other states, permits service on nonresident defendants subject only to "due process of law." R. 4:4-4(e). In other words, we will allow out-of-state service to the uttermost limits permitted by the United States Constitution. See Roland v. Modell's Shoppers World of Bergen Cty., 92 N.J. Super. 1, 7 (App. Div. 1966). [at 268]
In Buckley v. New York Post Corp., 373 F.2d 175 (2 Cir.1967), Judge Friendly held that distribution of an alleged defamatory article in plaintiff's home state of Connecticut was tortious conduct committed in that state, and defendant was subject to jurisdiction of a court in Connecticut by service under the state's long-arm statute. He concluded that the single publication rule was not to be used, nor was it its purpose, to deprive a plaintiff defamed in his home state of a *390 privilege to sue there even if the newspaper was printed elsewhere.
To hold that the single-publication rule exempts a publisher of a newspaper or magazine or a broadcaster from a long-arm statute that would otherwise have been applicable would be quite as artificial as the "last event" approach of the first Conflicts Restatement and the separate publication concept of Duke of Brunswick v. Harmer, 14 Q.B. 185, 117 Eng. Rep. 75 (1849), which the new rule was intended to overcome. Elliptical statements that a libel by newspaper is "complete" upon publication, though often accurate enough in their particular context, should not obscure that the purpose of the single publication rule is not to deprive a plaintiff defamed in another state of a privilege to sue there which the legislature had granted generally to persons injured by wrongful conduct within its borders, but rather to protect the defendant  and the courts  from a multiplicity of suits, an almost endless tolling of the statute of limitations, and diversity in applicable substantive law. [at 179-180]
The court concluded there was no violation of due process of law concepts in holding the long-arm statute applicable to the New York Post.
In respect to the problem of a publisher departing from normal trade practices in releasing publications to establish a defense under the statute of limitations, equity has long recognized that a defendant may be estopped from pleading the statute of limitations if he is guilty of inequitable conduct. Cf. Partrick v. Groves, 115 N.J. Eq. 208 (E. & A. 1933); State v. United States Steel, 22 N.J. 341, pp. 356-359 (1956).
This court concludes that the principles which underlie the single publication rule are in accord with the public policies of this State, and the potential problems referred to above are manageable under existing New Jersey law.
The court finds that the general release date of the book herein was November 15, 1971; that publisher followed trade practices in the general release of the book and subsequent sales; that the printing of the 2,500 hard cover copies in February 1972 was sufficiently close to the first printing to be considered as part of it and not a second publication or a *391 republication; and that the cause of action for damages for libel which Barres had on November 15, 1971 embraced or engrossed said 2,500 copies.
The court further finds that the bulk sale in August 1973 to a remainder outlet was not the equivalent of a republication but a recognition by publisher that the book had in that form come to the end of its circulation. This act was also performed in accordance with trade practice.
However, there are facts present in this case which distinguish it from any examined by the court. By reason of the default of author, Barres may establish and obtain judgment in his proof action that the material complained of is libelous. This court does not intend to suggest what is proper to the court which may hear that action, but notes there are decisions suggesting that author in such an action may not plead the statute of limitations, for it is an affirmative defense. See Perry v. Crunden, 79 N.J. Super. 285 (Cty. Ct. 1963). Under such circumstances Barres may recover a money judgment on the basis that the offensive material is libelous. Whether Barres will be able to collect the judgment is not now known.
Furthermore, publisher will still be filling orders for the book if the single publication rule is applied to bar all relief against it. As the cases have noted, the single publication rule has been developed by the courts and should not be applied mechanically to produce results at variance with broader purposes of the law such, as here, protection of reputation.
Since the abolition of the Star Chamber Court, the courts have refused to issue injunctions to prevent the circulation of alleged libels or slanders.[5] They have done this to avoid *392 interference with free speech and the right of defendants to have juries pass on the question of whether the material is libelous or slanderous. The courts have also felt that the sanction of civil damages, and the criminal penalties, for libel or slander are sufficient deterrents to protect reputation. See Kwass v. Kersey, 139 W. Va. 497, 81 S.E.2d 237, 47 A.L.R.2d 695 (Sup. Ct. 1954). However, some courts have said that if a plaintiff in an action for personal defamation recovers a judgment on the ground that the material complained of is libelous, then such plaintiff might be entitled to an injunction against further circulation of the same material in order to avoid a multiplicity of suits for damages. See the dictum in Wolf v. Harris, 267 Mo. 405, 184 S.W. 1139 (Sup. Ct. 1916) where the court reversed the granting of an injunction before trial to restrain circulation of printed matter about a physician, stating:
* * * Or, even if plaintiff had joined a count at law for damages for libel with a count for injunction on the theory of a threatened continuance of the false publication, and had alleged and proved, either the inadequacy of remedy by reason of the libeler's insolvency, or the legal necessity of the remedy sought in order to avoid a multiplicity of suits, the court nisi, upon a finding by the jury of the libel, and *393 by the court of the said necessary facts on the equity side, could have enjoined continued publication thereof. Since, however, there is in the instant case neither conspiracy nor threats to others, nor a verdict of a jury upon the fact of libel, we are constrained to say that this judgment cannot stand.
Let it be reversed. All concur. [at 1142]
See, also the dicta in Birnbaum v. Wilcox-Gay Corp., 17 F.R.D. 133, 139-140 (N.D. Ill. 1953); Ryan v. Warrensburg, 342 Mo. 761, 117 S.W.2d 303 (Sup. Ct. 1938); Flint v. Hutchinson Smoke Burner Co., 110 Mo. 492, 19 S.W. 804 (1892); Pound, "Equitable Relief Against Defamation and Injuries to Personalty," 29 Harv. L. Rev. 640 (1916).
As noted by Judge Desmond in his dissent in Gregoire v. G.P. Putnam's Sons, supra, "The book publisher keeps his stock on his shelves and sends out books as called for * * *" (81 N.E.2d at 50), and as stated in Wheeler v. Dell Publishing Co., supra, such books are not simply "* * * like echoes of spoken defamation," (300 F.2d at 375). The facts in this case indicate that circulation is occurring and may continue even if a judgment is entered on the basis that the material is libelous. This court does not know whether a judgment against author is realizable. The decision in Kwass v. Kersey, supra, (Annotation 47 A.L.R. 2d 715 (1956)), indicates the need for caution in considering granting of injunctions in respect to libel or slander. In the development of the single publication rule, particularly in respect to a stockpile of books that may circulate for years, consideration should be given to the application of equitable principles where appropriate to complete the relief envisioned by those developing the rule, i.e., resolution of all matters in one action.
For the reasons stated previously, the court grants partial summary judgment in favor of publisher based on the one-year statute of limitations as to the claim for damages based on libel, without prejudice to Barres seeking leave to amend the complaint for equitable relief in the event that Barres is able to obtain a judgment against author on *394 the ground that the disputed material is libelous, and without prejudice to publisher filing an answer asserting any defenses to any relief sought by Barres, including defenses based on truth, privilege (including fair comment) and lack of a right to or need for an injunction. In view of the brevity of the material complained of, publisher may consider whether the need for an injunction may be defeated by deletion of the material.
To decide otherwise may result in Barres obtaining a judgment based on a determination that the material is libelous, while publisher would remain free to circulate such material. Although this court does not now express an opinion as to the merits of any possible claim by Barres for equitable relief, the result reached herein would leave the court hearing the matter free to determine what relief, if any, should be granted as against publisher in order to achieve a result consistent with any adjudication pertaining to author, and not as suggested by Judge Desmond in Gregoire v. G.P. Putnam's Sons, supra, 81 N.E.2d at 51, granting "a license for continued wrongdoing."
Against this consideration the court hearing the matter must weigh the maxim that equity follows the law and will normally deny relief where no action at law may be maintained. Cf. Hedges v. Dixon County, 150 U.S. 182, 14 S.Ct. 71, 37 L.Ed. 1044 (1893); Giberson v. First National Bank of Spring Lake, 100 N.J. Eq. 502 (Ch. 1927), Mullany v. Mullany, 4 N.J. Eq. 16 (Ch. 1837). As stated in 2 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 425:
* * * As a practical rule [that equity follows the law], and not a mere verbal theory, it is wholly restrictive in its operation, and its only object is to keep the jurisdiction of equity from overstepping the boundaries which have been established by the prior course of adjudication. * * * Equity follows the law, * * * whether contained in the common or in the statute law. * * * [at 188]
It is further stated therein that:
* * * [C]ourts of equity frequently refuse relief where it appears that the complainant has delayed seeking the aid of the court for *395 a period comparable to the one appearing in the statute of limitations. * * * [at 193]
It is for the court hearing the matter to resolve these issues.
Submit appropriate order.
NOTES
[1] This ground was abandoned at the first hearing on the motion. Author failed to enter an appearance or answer. Default was entered as to him. Author was a resident of Newark and was served in Newark.
[2] The court invited supplemental briefs on the question of whether any problem existed under conflict of laws. Neither plaintiff nor defendant contends that any law other than the law of New Jersey applies. There is no problem of jurisdiction, since author and publisher were served in New Jersey. Barres and author are residents of New Jersey. Publisher distributed the book in New Jersey from its warehouse in New Jersey and advertised the book in New Jersey newspapers. The books concerned events in New Jersy and Barres as a public official in New Jersey.

The court concludes that no other state has a more substantial interest in this matter than New Jersey.
This is consistent with the position of Restatement, Conflict of Laws 2d, § 150 at 455 (1971), which states:
(1) The rights and liabilites that arise from defamatory matter in any one edition of a book or newspaper, or any one broadcast over radio or television, exhibition of a motion picture, or similar aggregate communication are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
(2) When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state.
The court has not given any further consideration to the problem under the conflict of law principles. Cf. Zuck v. Interstate Publishing Corp., 317 F.2d 727 (2 Cir.1963); Hartmann v. Time, Inc., 166 F.2d 127 (3 Cir.1947); Cassius v. Mortimer, 161 F. Supp. 74 (S.D.N.Y. 1957); 1 Harper & James, Law of Torts, § 5.16.
[3] At least the following states have adopted the statute: Arizona. California, Idaho, Illinois, New Mexico, North Dakota, Panama Canal Zone and Pennsylvania.
[4] "The question deals with whether or not the defendants in this case are subject to the jurisdiction of [the Montana federal court] because `* * * The cause of action [is] * * * one which arises out of, or results from the activities of the defendant within the forum * * *' Brecht v. RMK-BRJ, 24 St. Reptr. 761, 763 (Dist. of Mont. 1967); L.B. [D.] Reeder Contractors of Arizona v. Higgins Industries, Inc., 265 F.2d 768 (9th Cir.1959); Rule 4(e), Federal Rules of Civil Procedure; and Rule 4B(1), Montana Rules of Civil Procedure. If Montana follows what is defined below as the multi-publication rule, the cause of action in this case arose upon the arrival and sale of the defendants' periodicals in Montana. If, on the other hand, Montana follows what is defined below as the single publication rule, one cause of action arose upon the first publication or printing of the articles, and no other cause of action can arise out of the publication of the articles." [512 P.2d at 703-704]
[5] An early case establishing this principle is Brandreth v. Lance, 8 Paige (N.Y.) 24 decided in 1839, and cited in Kwass v. Kersey, 139 W. Va. 497, 81 S.E.2d 237, 243, 47 A.L.R. 2d 695, 704 (Sup. Ct. 1954). The following appears in the latter decision, with the quotation coming from Brandreth, supra:

"This bill presents the simple case of an application to the court of chancery to restrain the publication of a pamphlet which purports to be a literary work, undoubtedly a tale of fiction, on the ground that it is intended as a libel upon the complainant. The court of star chamber in England, once exercised the power of cutting off the ears, branding the foreheads, and slitting the noses of the libellers of important personages. (Hudson's Star Chamber, 2 Collect Jurid 224.) And, as an incident to such a jurisdiction, that court was undoubtedly in the habit of restraining the publication of such libels by injunction. Since that court was abolished, however, I believe there is but one case upon record in which any court, either in this country or in England, has attempted, by an injunction or order of the court, to prohibit or restrain the publication of a libel, as such, in anticipation. In the case to which I allude the notorious Scroggs, chief justice of the court of king's bench, and his associates, decided that they might be safely entrusted with the power of prohibiting and suppressing such publications as they might deem to be libellous." The House of Commons of the Parliament of Great Britian impeached Scroggs for the exercise of such power. [81 S.E.2d at 243, 47 A.L.R.2d at 704]. But see Pound, Equitable Relief Against Defamation and Injuries to Personalty, 29 Harv. L. Rev. 640, 650 (1916) where historical accuracy of foregoing is questioned.