**DALE SYSTEM, Inc.,**

v.

**TIME, Inc. et al.**

**Civ. A. No. 3787.**

United States District Court
D. Connecticut.

Jan. 28, 1953.

Fleming James, Jr., Harry P. Lander, New Haven, Conn., for plaintiff.

Cummings & Lockwood, by William H. Timbers, Stamford, Conn., for defendants.

HINCKS, Chief Judge.

This is an action in tort. Plaintiff is a Connecticut corporation which furnishes to clients, most of which are retail stores, in Connecticut, New York, Massachusetts, Rhode Island and New Jersey,

a service for testing the efficiency and honesty of the clients' employees. This is done by reports recording the experiences of plaintiff's employees, posing as ordinary customers, in making purchases at the clients' stores. Defendant Willmark is engaged in the same line of business. Both Willmark and Time are New York corporations.

The complaint alleges that the defendants caused to be published an article in Life magazine describing in detail Willmark's business and asserting falsely and maliciously that Willmark was "unique" and "the only company of its kind." The complaint also alleges that the defendants caused the Life article to be digested in the Readers Digest of September 1951, in which it was falsely and maliciously stated that Willmark is "the only company of its kind in the world"; and that the defendants caused to be broadcast over radio Station W O R a summary of the Readers Digest article with the statement that "Willmark is the only company of its kind."

The parties have stipulated as follows. The text of the Life article was prepared in New York, the plates were made in Illinois, and printing first commenced in Illinois which was followed by printing in Philadelphia and Los Angeles. The broadcast took place from a studio in New York City, but was accomplished through a transmitter located in New Jersey. The broadcast could be heard from Massachusetts to Georgia. The Readers Digest article was edited in New York; its plates were made in New Hampshire; the printing for the domestic issue was done in New Hampshire and Ohio; and foreign editions were printed in many foreign countries. And it was in New York that Willmark gave Time the information upon which the alleged publications were made.

The defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, and plaintiff has moved to strike defendants' first defense, which is that the complaint fails to state a claim upon which relief can be granted.

There has long been an affinity between the legal philosophies of the courts of New York and of Connecticut, and also between the *mores* of the citizens of those neighboring states, which has developed an awareness of the desirability of uniformity in the laws which govern the transactions and relations between the citizens of one of these States with citizens of the other. Although the Connecticut courts as yet have had no occasion to discuss and pass upon the "single publication" rule which has been adopted in New York as recently restated in Gregoire v. G. P. Putnam's Sons, 298 N.Y. 119, 81 N.E.2d 45, 50, the foregoing considerations, coupled with the general policy of the Connecticut courts to shape the law of the State to harmonize with the realities of contemporary life, convince me that a Connecticut court if confronted with this case would adopt the "single publication rule". It would hold, I think, that the complaint purported to state at most three torts: one growing out of the publication in Life, one out of that in Readers Digest and the other out of the W O R broadcast; and that on each the Statute of Limitations began to run "when the finished product (was) released by the publisher for sale in accord with trade practice", as stated in the Gregoire opinion. cf. Mattox v. News Syndicate Co., 2 Cir., 176 F.2d 897, 12 A.L.R.2d 988.

But when it comes to determine the State, the law of which shall govern a case such as this of libel published in many states, there appear to be no cases in Connecticut, or New York, or indeed in other jurisdictions where the single publication rule prevails, which lay down an authoritative conflict of laws rule of general application or which even discuss the underlying problem. However, the subject-matter has had some discussion in the law reviews. See 60 Harv.L.R. 941; 62 do. 1041; 63 do., 1272; 48 Col.L.R. 932. As the note just cited from the Columbia Review convincingly demonstrates, the "single publication" rule fails to achieve its major

objective as a needed development of the substantive law if in practice it is tied to a multiple-publication, conflict-of-laws rule. The terrifying babel of media having publications of nation-wide and international scope urgently requires the development of a conflict of laws rule which shall provide the certainty so essential for the protection of the public, an ease of application which is so helpful to judicial administration and without which justice through litigation becomes for many an unattainable luxury, and an intrinsic realism whereby the existence and incidents of a libel may be determined by the law of the place in which generally, more often than not, the libel will have done the most harm. The law of the plaintiff's domicil, I think, best meets these and any other pertinent requirements. Acting vicariously, as it were, for the Connecticut Courts I hold the Connecticut conflict of laws rule to be that the law of plaintiff's domicil is the law to be applied to a multi-state libel which has been communicated in the state of plaintiff's domicil as well as in other jurisdictions.

Such a rule is not in essential conflict with traditional concepts. The Restatement of Conflicts of Laws in speaking of harm to the reputation says the place of the wrong is where the defamatory statement is communicated. Sec. 377, Par. 5. In so stating, the reporter did not appear to have in mind a multi-state publication. But illustration No. 7, immediately following Par. 5 of Sec. 377, expressly deals with a publication in two states and locates the place of wrong in that jurisdiction in which the plaintiff was well and favorably known. It is merely one more step in the development of the rule to say that in cases of publication occurring in several states in which plaintiff is well and favorably known, the law of the State of his domicil shall control because the most reasonable inference is that there he is better known than elsewhere. From the standpoint of tradition this development of the conflict of laws rule is no more radical than the development of the single-publication rule.

After all, a plaintiff's repute is his character and personality in the eyes of others. It thus comprises myriad relationships in all of which the plaintiff's individuality is the focus. Thus viewed, the concept of repute, even though not involving legal relationships, is akin to the concept of status which traditionally is determined by the law of the domicil. The same compelling reasons for applying the law of the domicil to the determination of one's status require that the law of the domicil should determine one's right to his good repute: in cases of multi-state libel generally the greatest harm to repute will occur in the state of domicil.

Of course the artificial rule whereby a corporation is deemed to be domiciled in the state of its incorporation irrespective of the places of its greater activities may at times create situations in which there is substantially less harm to the corporate business by libelous publication in the state of incorporation than by publications occurring where it is more active. For this reason perhaps something could be said for a rule fixing the location of the harm to a corporation in the state of its principal office rather than its domicil. If such were the rule here, the same result would obtain: the plaintiff here is a Connecticut corporation having its principal place of business in Connecticut. However, in my opinion the certainty of domicil and its use generally to locate the law which governs many corporate relationships, commends a rule whereby the law of plaintiff's corporate domicil shall govern also questions relating to harm to its repute.

It may seem arbitrary to apply the law of the domicil when plaintiff has done business and is well known in half a dozen other states, as appears to be the case here. But so far as that goes, the rule fixing corporate domicil in the state of incorporation is itself highly artificial and often unrealistic in its application.

And after all, it is a frequent occurrence in litigations involving corporations for a court to turn from the law of the forum to the law of domicil for the determination of many questions relating to corporate relationships. It is no more arbitrary to look to the law of the domicil to determine questions involving the substance of injuries to one's right to his good repute. The certainty of the rule and its ease of application amply compensate for any artificiality in its occasional incidence.

If it should seem at first glance that the rule is without reasonable relation to the subject-matter, reflection will demonstrate that no other rule—at least no other *uniform* rule—more reasonably related could be devised. The Gregoire case fixes as *the time* when the multistate libel arises as that "when the finished product is released by the publisher for sale in accord with trade practice." If we were to adopt the rule that the *place of wrong* is the place where the product was released, etc., as likely as not it might be that the place of release was not only difficult to determine but also some place completely unrelated to plaintiff's injury. For example, under the stipulation here, the "release" of the Life issue might be found to have occurred in Illinois or California where plaintiff was not known at all.

In addition to its simplicity, certainty and ease of application the rule of plaintiff's domicil has some merit for its tendency to prevent plaintiff from shopping for the most favorable out of a plurality of jurisdictions: wherever it sues the same law will apply. And surely one would not expect that future libel litigation as a plaintiff would influence the choice of the state in which to incorporate. On the other hand, somewhat less remote is the possibility that a corporation engaging in publishing as its principal business and hence peculiarly liable to libel actions, might be influenced to incorporate in a state the law of which was deemed favorable to defendants in libel suits, if the *defend-*

*ant's domicil,* were deemed to be a factor in determining the choice of law.

It is perhaps worth noting that an application of the conflict of laws rule herein announced would have produced no different result in Mattox v. News Syndicate Co., 2 Cir., 176 F.2d 897, 12 A.L.R.2d 988, and that it was applied, although without discussion, in Brinkley v. Fishbein, 5 Cir., 110 F.2d 62; Caldwell v. Crowell-Collier Pub. Co., 5 Cir., 161 F.2d 333; and Curley v. Curtis Publishing Co., D.C., 48 F.Supp. 29. And the rule evolved in Dale System, Inc. v. General Teleradio, Inc., D.C.S.D. N.Y., 105 F.Supp. 745, as I understand it, could well result in the choice of Connecticut law for application to the case here now that Connecticut, instead of New York, is the forum-State.

■ Coming then to a consideration of the merits, I note that the Connecticut courts have followed the rule generally prevailing which recognizes as defamatory language which charges both (a) "improper conduct or lack of skill or integrity in one's profession or business" and (b) "is of such a nature that it is calculated to cause injury to one in his profession or business." Proto v. Bridgeport Herald Corp., 136 Conn. 557, 558, 72 A.2d 820, 826; Herman v. Post, 98 Conn. 792, 120 A. 606; Pascone v. Morning Union Co., 79 Conn. 523, 65 A. 972; Sumner v. Utley, 7 Conn. 257; Corsello v. Emerson Bros., Inc., 106 Conn. 127, 137 A. 390; Petrucelli v. Catapano, 107 Conn. 122, 139 A. 634. Prosser on Torts, pg. 780, 786. In Donaghue v. Gaffy, 53 Conn. 43, 2 A. 397, the language complained of, by creating personal animosity against the plaintiff, certainly tended to injure the plaintiff's business; but it was held not actionable because it did not satisfy the companion requirement of the Proto definition, namely, the requirement of a charge of improper conduct of the business.

■ In deciding whether the language complained of is libelous the general rule is that "it is for the court in the first instance to determine whether

the words are reasonably capable of a particular interpretation; and it is then for the jury to say whether they were in fact so understood." Prosser on Torts, pg. 789. See also Restatement, Torts, Vol. 3, Sec. 614. This long has been the rule in Connecticut. Donaghue v. Gaffy, supra; Carey v. Woodruff, 89 Conn. 304, 94 A. 281; Yavis v. Sullivan, 137 Conn. 253, 76 A.2d 99; Proto v. Bridgeport Herald Corp., supra.

■ Turning then to the task of interpretation thus cast upon the judge, I rule that it clearly was not defamatory of the plaintiff to say that the government "paid Willmark's essentiality a supreme compliment, etc." and that Willmark was "unique". Surely such assertions cast no aspersions on the plaintiff's honesty, efficiency or other business characteristic, and the language therefore did not satisfy the first requirement of the Proto test, stated above. In so ruling, I of course take as true the allegations of the complaint (the "colloquium", as it used to be called) that the plaintiff is engaged in a business of the same kind as that of Willmark: no person—not even one knowing of plaintiff's existence and the nature of its business—could reasonably understand such assertions to mean that plaintiff was lacking in uniqueness and essentiality. And even if such *were* the meaning, it was not defamatory within the definitions above quoted and referred to.

■ Possibly of more serious implication was the published assertion that "Willmark was the only company of its kind." For present purposes, I assume that this comment in the light of the colloquium meant that there was no such company as the plaintiff or that the plaintiff's business was not of the same kind as that of the plaintiff's. Similar language was so interpreted in Davis v. New England Ry. Pub. Co., 1909, 203 Mass. 470, 89 N.E. 565, 25 L.R.A.,N.S., 1024. But, even so, the court there observed that the writing was not technically a libel. And in Jarrahdale Timber Co. v. Temperley & Co., Q.B.Div.

1894–5, 11 T.L.R. 119, similar language was viewed not as defamatory but rather, like the Davis publication just referred to, as enjoinable on other grounds. Of the multitude of cases cited in the briefs, these two are closest on the facts to the instant case.

Here, too, I hold the language non-defamatory: this language, too, did not charge improper conduct of the plaintiff's business which was the first essential of the Proto definition quoted above. Let it be granted that the effect of the published statement was to discourage potential clients from searching out the plaintiff and retaining its services, and that therefore the statement satisfied the second essential of the Proto definition quoted above. Nevertheless, unless the statement by disparaging the plaintiff's business methods or efficiency satisfied the first Proto essential also, the case falls within the holding of the Donaghue case and must be held non-libelous.

Whether such a statement, if not libelous, is actionable as tending to impair the plaintiff's competitive position is the final problem in the case to which I now come. This question is raised in a section of the plaintiff's brief captioned as "wilful interference with the reasonable business expectancies of competitor." This is one aspect of the tort of unfair competition which in Prosser's illuminating treatise on Torts seems to be a blend of conduct discussed as "interference with prospective advantage" in Sec. 105 and "injurious falsehood" in Sec. 106. Prof. Jeremiah Smith suggested as a more accurate but certainly a more cumbersome (and, I think, a less descriptive) name of such a tort "injurious falsehood other than such statements as amount to defamation or deceit." Cal. Law Rev. Vol. XIII, pg. 132. As Prosser points out, the development of a tort action for such interference with a competitor "ran parallel to that for interference with existing contracts, Id. pg. 1017, and interference with contractual relationships is a subject broad enough to include not only existing contracts with particular persons but also the ex-

pectation of pecuniary or economic advantage from dealings with others, such as the prospect of obtaining future customers, or of future employment." Id. pg. 972.

Merely because no claim sounding in defamation has been stated, as I have ruled, it does not follow that there is no case for interference with a pecuniary expectancy. Here the interference is alleged to have been accomplished intentionally by means of a false statement as to the plaintiff's lack of existence or lack of a business similar to that of the plaintiff. Such an interference Prosser recognizes as a distinct form of tort for which he prefers the name of "injurious falsehood" to that of "disparagement". Id. pg. 1037. To establish such a case the plaintiff must prove not only the publication but also its falsity and in addition that "the publication played a material and substantial part in inducing others not to deal with" it, Id. pg. 1042, and that as a result he suffered "pecuniary loss". Id. pg. 1043.

Prosser goes on to say, Id. pg. 1044, that under the general rule to make a case for injurious falsehood "it is not enough to show a general decline in his business resulting from the falsehood, even where no other cause for it is apparent, and that it is only the loss of specific sales that can be recovered." And the defendant argues vigorously that pursuant to this rule the complaint fails to state a case of injurious falsehood because it fails to allege "special damages" consisting of the loss of specified clients and retainers. This is an extremely technical doctrine. It is contrary to the underlying principle that damages for torts need not be proved by a degree of certainty which the defendant's conduct has made impossible. As Prosser observes, in situations in which an injunction is not appropriate, the effect of the rule is to leave "a serious and genuine wrong without a remedy."

Perhaps the most lucid discussion of the problem is found in the leading case of Ratcliffe v. Evans, [1892] 2 Q. B.

524, the facts of which have a striking similarity to those of the instant case. There the applicable rule was stated to require "as much certainty and particularity * * * in pleading and proof of damage, as is reasonable, having regard to the circumstances and to the nature of the acts themselves by which the damage is done." And the court, through Bowen, L. J., observed: "To insist upon less would be to relax old and intelligible principles. To insist upon more would be the vainest pedantry." The court sustained as an adequate statement of the claimed damages an allegation that the plaintiff "lost profits which he otherwise would have made in his said business" and held that proof "of general loss of business without specific proof of the loss of any particular customers or orders" was admissible and sufficient. The court concluded with these words: "In the case before us today it is a falsehood openly disseminated through the press—probably real, and possibly acted on, by persons of whom the plaintiff never heard. To refuse with reference to such a subject-matter to admit such general evidence would be to misunderstand and warp the meaning of old expressions; to depart from, and not to follow, old rules; and, in addition to all this, would involve an absolute denial of justice and of redress for the very mischief which was intended to be committed."

A similar holding was made in the Davis and Jarrahdale cases cited above; also in Advance Music Corp. v. American Tobacco Co., 296 N.Y. 79, 70 N.E.2d 401. See also Col.Law Rev.Vol. XIII, pg. 121, et seq.

It is not necessary for me to speculate whether, if the problem were one of first impression in Connecticut, a Connecticut court would adopt the strict rule which Prosser regretfully states as being that most widely prevailing, or the more liberal rule of Ratcliffe v. Evans. The Connecticut courts have already adopted the more liberal rule. Skene v. Carayanis, 103 Conn. 708, 131 A. 497 holds that intentional interfer-

ence with a prospective advantage is indeed actionable. In Wyeman v. Deady, 79 Conn. 414, 65 A. 129, 130, upon his complaint that by the defendant's wrongful conduct the plaintiff "has been greatly injured in his business, and has been greatly damaged by the unlawful action of the defendants", it was held that the damages awarded were justified and that "the jury may have found, as alleged in the complaint, that the plaintiff was otherwise injured in his business, than by the loss of employment". In other words the plaintiff was held entitled to general damages without allegation of special damages. Kimball v. Hall, 87 Conn. 563, 89 A. 166, L.R.A. 1916E, 632, is another Connecticut case in which it was held that it might have been found that the defendant's deceitful conduct had diminished the business of the plaintiff, a competitor, and that consequently the non-suit had been erroneously granted. And in Savoy Laundry & Linen Supply, Inc. v. Morgan Linen Service, Inc., 16 Conn.Supp. 408, the "second practice" therein complained of was disparagement of plaintiff's business methods by the defendant, a business competitor. It is true that no substantial damages were awarded because no special or actual damages had been proved. However, for its impact on my ruling here it is significant that Judge O'Sullivan allowed the plaintiff nominal damages, thus indicating a holding that an actionable tort in the nature of unfair competition had been stated and proved. In Kimball v. Hall, supra, it had been held that at least nominal damages should be allowed on proof of unfair competition even if the evidence should fail to connect a substantial loss by the plaintiff with the defendant's wrongful conduct.

■ If I am right in my conclusion, expressed above, that under the Connecticut conflict of laws rule, the law of plaintiff's domicil must define the substance of the plaintiff's rights, the Connecticut cases cited are of course binding on me under the doctrine of the Erie case (Erie R. Co. v. Tompkins, 304 U. S. 64, 58 S.Ct. 817, 82 L.Ed. 1188). And testing the complaint, in its aspect as a charge of unfair competition by means of injurious falsehood against Willmark, for its procedural sufficiency, I hold that its allegation of "the greater diminution of the business and profits of the plaintiff" is a pleading not in contravention of F.R.C.P. 9(g), 28 U.S.C.A., requiring that "when items of special damage are claimed, they shall be specifically stated." Consistently with this rule, on trial general evidence of lost profits may be received: but not, of course, loss of particular clients or retainers. It follows that as to so much of the complaint as seeks damages against Willmark, the *motion to dismiss should be denied: an action at law for unfair competition by means of the publication of a false statement is sufficiently stated to entitle plaintiff to a trial.*

■ However, to the extent that the complaint purports to state an action for an injunction I have already ruled that as against the defendant Time it should be wholly dismissed. And I rule now that as a claim for injunctive relief against Willwark it should also be dismissed. This in effect means that the claims for relief 2–5 inclusive should be deemed stricken. It is true that in words these claims are directed against both defendants "and each of them." But with Time out of the case it is apparent from a reading of the complaint that it is beyond the power of Willmark to execute the injunctive provisions sought. Nor is there foundation in the complaint for a claim of threatened injury from a repetition of Willmark's wrongful conduct. It is plausible to believe that a similar situation in the Savoy Laundry case led Judge O'Sullivan there to withhold the injunction sought although his award of nominal damages imports that he found that the charge of unfair competition had been proved.

■ Although, as I have ruled, the plaintiff is entitled to trial on its charge of unfair competition by injurious falsehood, it does not follow that any of the essentials of the plaintiff's case

as in libel cases will be presumed. It can prevail only on proof of all the essentials of its case and can recover substantial damages only if it sustains by proof its allegation (1) of lost profits, (2) proximately caused by defendant's wrongful act. And especially since this memorandum has been concerned with charges of unfair competition, considerations of fairness suggest that I now make it plain, lest this memorandum encounter an untutored eye, that on a motion such as this the court at this stage must assume that allegations of unfair dealing or wrongful conduct on the part of the defendant are true. Of course for aught that now appears, on trial it well may be that the trier will find that the conduct complained of was neither unfair nor wrong.

Ordered in accordance with the foregoing.