ELIZABETH GRANT ET AL., COEXECUTORS (ESTATE OF PASQUALE STELLATO) *v*. THE WEST HAVEN GARDENS COMPANY ET AL.

COTTER, C. J., LOISELLE, BOGDANSKI, PETERS and HEALEY, Js.

Argued April 1—decision released July 1, 1980

*William F. Gallagher,* with whom, on the brief, was *Charles P. Costanzo,* for the appellants (named defendant et al.).

*Dennis N. Garvey,* with whom, on the brief, was *Edward L. Walsh,* for the appellees (plaintiffs).

LOISELLE, J. The defendants appeal from a judgment rendered for the plaintiffs claiming that the findings of fact are insufficient as a matter of law to support the conclusion that the plaintiffs are entitled to an award in the amount of $60,000. Since the facts found are in issue, we review those findings in some detail.

The plaintiffs are coexecutors of the estate of Pasquale Stellato. The defendants are G. Thomas Vitagliano and West Haven Gardens Company, of which Vitagliano is president. The defendants admitted that at all times mentioned in this action, Vitagliano acted in his capacity and within the scope of his authority as president and an agent of West Haven Gardens. Robert Simpson, an employee of West Haven Gardens, was also a defendant at trial. The court awarded the plaintiffs $1000 against Simpson who chose not to appeal.

From 1957 until the date of his death on June 1, 1974, Pasquale Stellato resided with his wife in the home he had built at 173 Canton Street, West Haven. Approximately three years before his sudden death at the age of 84, Stellato conveyed the property to West Haven Gardens, but he and his wife continued to live there. His wife lived there after he died until August, 1974.

On August 15, 1974, the defendants began demolition of Stellato's former residence in preparation for construction of an apartment house. Vitagliano,

Simpson and another employee Jay Hickerson were present. The demolition process attracted the neighbors, Mr. and Mrs. Malenda, who lived across the street. They observed the bulldozer operated by Simpson as it destroyed the Stellato home and knocked down the cinder block walls of the foundation.

As the bulldozer struck the foundation near the front porch, many rolls of money fell out of the cinder blocks. When he had finished demolishing the front porch, Simpson observed the money on the ground. He got off the bulldozer and called Vitagliano to see what he had discovered. The rolls of bills were wrapped in aluminum foil and rubber bands. Each roll was approximately three and one-half inches in diameter, about the diameter of a baseball. The collision of the bulldozer with the house had caused some of the rolls to come apart.

Vitagliano, who had been sitting with Hickerson on the steps of an adjacent building, immediately came to the area where Simpson had discovered the money. Vitagliano got down on his hands and knees and stuffed all the rolls and the remaining loose bills in his shirt. Simpson, who was within six to seven feet of Vitagliano at the time, observed him picking up bunches of bills. The Malendas, who were on friendly terms with Vitagliano, observed the defendants' actions from a distance of thirty to forty feet away. Mr. Malenda observed Vitagliano pick up four or five secured rolls and the bills from one additional roll which had broken apart and stuff them in his shirt. Mrs. Malenda observed Vitagliano pick up between five and seven rolls and the bills from two or three additional rolls which had broken apart and stuff them in his shirt. Immediately after

Vitagliano finished stuffing the money in his shirt, which created a huge bulge, the Malendas heard him tell one of his employees that the bills he found totaled $60,000 to $70,000.

Simpson, who picked up $1000 in loose bills at random, found only bills of $100 denomination. All bills seen by Simpson, who had discovered the money, were located within a five foot radius and were in $100 denomination. Later that day Mr. Malenda found one $100 bill among the debris.

As soon as Vitagliano finished stuffing the money into his shirt, his wife, accompanied by their two children aged two and four, arrived at the job site in her automobile. Vitagliano pulled the children from the car, left them with Hickerson and told his wife to drive him home. He was very nervous during the drive home. His wife was upset because he had dragged the children out of the car. When she asked him what happened, he opened his shirt and she saw the money. When they arrived home, Vitagliano told his wife to remain in the car. He entered the house, put the money in a bag and hid it in the attic.

His wife drove him back to the job site. Later that day Simpson gave Vitagliano $200 of the money he had found. That evening Vitagliano returned to the job site alone with the money and counted it in his trailer. He never, even as of the date of trial, told his wife how much money he had found. Nor did he ever return or offer to return any of the money found to the estate or the heirs of Pasquale Stellato.

Pasquale Stellato was a frugal man. Before he retired in the 1960s, he worked for the Hotel Taft

in New Haven. At home he raised his own fruits and vegetables, which he and his wife canned, in a garden which was like a small farm. He purchased only the bare necessities for himself and his wife. His weekly expenditures for food did not exceed fifteen dollars. He bought only dented cans and items which had been reduced in price at the store. Stellato did not own an automobile. His home, which was modestly furnished, was free of encumbrances. Any medical bills incurred by him and his wife in their later years were paid by medicare. Stellato was so careful with his money that he was even able to save a portion of his social security benefits.

Stellato always paid cash, which he wrapped in tin foil, for his purchases. He never had a checking account. He did not rent a safe deposit box. Having suffered losses in the bank closings during the depression, Stellato distrusted banking institutions and told his relatives and neighbors to put only part of their money in the bank and to keep the rest at home.

Stellato bought and sold many tracts of real estate during his lifetime. He sold his mortgage free home on Canton Street in West Haven to West Haven Gardens for $70,000. The parties stipulated that Stellato had received $76,900 from eighteen other real estate transactions in West Haven. He also received $32,000 from the sale of real estate in Florida, in addition to other income from the sale of property in Florida and Italy. Between 1960 and 1970, Stellato paid $7066.39 in real estate taxes. Between 1962 and 1971, when he sold the Canton Street residence, he paid $422.80 per year in sewer assessments.

Sometime in the late 1950s, after selling some real estate in Florida, Stellato told his wife and daughter that he had $50,000 to $60,000 hidden in the basement of 173 Canton Street. He told them to look in the basement if something happened to him because there would be money to care for his wife and to pay for his grandson's college education. During the summer of 1972, Stellato took his grandson to the bank and gave the teller $4000 cash wrapped in aluminum foil and rubber bands, in return for checks which he gave to his grandson to pay his college education expenses for the year. He paid his grandson's college education expenses for the following two years as well. When Stellato died suddenly in June, 1974, his family searched the basement of the home as he had told them to do but did not find the money.

The trial court concluded that the defendants must return the money found to the estate of Pasquale Stellato as the true owner, because the estate had constructive possession of the mislaid money. The amount of money found by the defendants, the court concluded, was equal to or greater than $60,000; the amount taken by the defendant Vitagliano, seven to ten rolls of bills and loose currency, or 1820 to 2600 bills, totaling $60,000 or more.

The defendants concede that the money they found in the walls of the former Stellato residence is the property of the plaintiffs and must be returned to them. *Sharkiewicz* v. *Lepone,* 139 Conn. 706, 707–708, 96 A.2d 796 (1953); *State* v. *Courtsol,* 89 Conn. 564, 568–69, 94 A. 973 (1915); see *Favorite* v. *Miller,* 176 Conn. 310, 312–13, 407 A.2d 974 (1978). The defendants' sole argument on appeal is that the court's conclusion that Vitagliano found and took

possession of $60,000 or more is speculative and conjectural, and is not reasonably and logically supported by the facts found.[1]

" 'Conclusions are not erroneous unless they violate law, logic or reason or are inconsistent with the subordinate facts. The court's conclusions are to be tested by the findings and not the evidence. . . . Conclusions logically supported by the finding must stand.' " (Citations omitted.) *Connecticut Coke Co.* v. *New Haven,* 169 Conn. 663, 675, 364 A.2d 178 (1975), quoting *State* v. *Warren,* 169 Conn. 207, 213, 363 A.2d 91 (1975). The court concluded from findings which are unchallenged that the defendant Vitagliano found and retained possession of at least $60,000. These findings include the defendant's own statement, heard by both Mr. and Mrs. Malenda, to one of his employees that the money he found totaled from $60,000 to $70,000; Stellato's statement in the late 1950s that he had hidden $50,000 to $60,000 in the basement; proof, largely undisputed, that Stellato had received more than $178,900 in real estate transactions before he died; and undisputed evidence that Stellato was an extremely frugal man who even managed to save a portion of his social security benefits. The only significant expenses he incurred during the years in question totaled approximately $23,000. The court found that he distrusted banks and there is no evidence in the record to show that any of the money which Stellato realized on his real estate transactions or saved from his social security was kept in a bank. The trial court also concluded that Stellato secreted

---

[1] The defendants also assigned error in facts allegedly found without evidence, failure to find material facts set forth in the draft finding and claimed to be admitted or undisputed, other conclusions alleged to have been found without facts, and claims of law overruled. These claims have been specifically abandoned.

"substantial sums of money" in the basement of his home. If he had secreted all of the income which the court found he had realized, less expenses as totaled above, he could have hidden more than $155,000 there, including the $50,000 to $60,000 which he revealed to his family in the late 1950s.

Simpson and Mr. Malenda testified that they saw only $100 bills. The court did not find that the rolls of money contained bills in any other denomination. The parties stipulated that each roll contained 260 bills. This evidence is relied upon by the defendants in their brief. In view of the Malendas' testimony, included in the finding, that Vitagliano took between four and seven bound rolls of bills plus loose bills from rolls which had broken apart, it is possible that Vitagliano stuffed between $104,000 and $172,000, not including the loose bills, in his shirt before he left the demolition site. In view of the court's conclusion that he took between seven and ten rolls, it is possible that he stuffed between $172,000 and $260,000 in his shirt. The court's conclusion that the defendant took only $60,000 is certainly reasonable in light of these findings. It is also logical and consistent with the subordinate facts, particularly when considered in light of Vitagliano's estimate at the job site which may be treated as an admission; *Hill* v. *Small,* 129 Conn. 604, 605, 30 A.2d 387 (1943); and the court's failure to find that all the bills found at the job site were of the $100 denomination.

The court concluded that the bills found in the demolition "in all probability were all of one hundred dollar denominations." The defendants attack this conclusion as speculative. Assuming it is speculative, the court clearly did not rely on this con-

clusion to assess damages. In another conclusion the court stated that Vitagliano removed and took possession of seven to ten rolls of bills and loose currency, or 1820 to 2600 bills in all. If the court had found that all of these bills were $100 bills, it could have assessed damages against the defendant at $182,000 to $260,000. It is clear from the ultimate conclusion reached and from the judgment rendered that the court's conclusion regarding the denomination of the bills was not the basis for its decision.

The only remaining determination to be made is whether the court's conclusion is supported by the law. Although there is no Connecticut case which establishes the nature or quantum of evidence required to prove damages in an action to recover personal property, the cases state several principles applicable here. " 'He who seeks to recover damages . . . must afford a basis for a reasonable estimate by the trier, court or jury, of the amount of that loss.' " *Mazzucco* v. *Krall Coal & Oil Co.*, 172 Conn. 355, 360, 374 A.2d 1047 (1977). As the findings indicate, the plaintiffs have certainly afforded a basis for a reasonable estimate for the trier. In *Johnson* v. *Flammia,* 169 Conn. 491, 500–501, 363 A.2d 1048 (1975), this court said: "The plaintiffs will not be denied a substantial recovery if they have produced the best evidence available and it is sufficient to afford a reasonable basis for estimating their loss." The evidence produced by the plaintiffs was certainly the best evidence available to them. They introduced testimony in their favor by every eyewitness but the defendant, who by his own admittedly wrongful conduct made the calculation of damages difficult. "Where a defendant has by his wrongful conduct made the calculation of damages difficult, he will not be heard to urge such

difficulty as a reason for not assessing by approximation. . . . 'From the very nature of the situation, the amount of loss cannot be proved with exactitude and all that can be required is that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation which will enable the trier to make a fair and reasonable estimate. . . . Mere difficulty in the assessment of damages is not a sufficient reason for refusing them where the right to them has been established.' " *Crowell* v. *Palmer,* 134 Conn. 502, 511, 58 A.2d 729 (1948), quoting *Ball* v. *Pardy Construction Co.,* 108 Conn. 549, 551, 143 A. 855 (1928). There is no question that the plaintiffs are entitled to damages. From the evidence presented and facts found the court was able to make a fair and reasonable estimate of those damages.[2] See also *Southern New England Contracting Co.* v. *State,* 165 Conn. 644, 661-62, 345 A.2d 550 (1974).

There is no error.

In this opinion the other judges concurred.

[2] Compare *Bronson & Townsend Co.* v. *Battistoni,* 167 Conn. 321, 326-27, 355 A.2d 299 (1974), in which the defendant failed to allege or submit testimony as to what constituted a reasonable bonus in support of his counterclaim. The court set aside the trial court's judgment for the defendant on the counterclaim.