In re Alfred M. CAPOZZIELLO, Debtor.

C.B.C. CONSTRUCTION COMPANY, Plaintiff,

v.

Alfred M. CAPOZZIELLO, Defendant.

Bankruptcy No. 5–84–00221.
Adv. No. 5–84–0078.

United States Bankruptcy Court, D. Connecticut.

Dec. 20, 1985.

William F. Dow, III, Jacobs, Grudberg & Belt, P.C., Peter L. Ressler, Groob, Ressler & Mulqueen, P.C., New Haven, Conn., for plaintiff.

Stuart M. Sheiman, Bridgeport, Conn., for defendant.

## MEMORANDUM OF DECISION

ALAN H.W. SHIFF, Bankruptcy Judge.

The plaintiff, C.B.C. Construction Company ("C.B.C."), an unsecured creditor, alleges that Alfred M. Capozziello, the defendant-debtor ("Capozziello"), willfully and maliciously damaged its property, consisting of two tractor type trucks, and seeks a determination that the resulting debt is nondischargeable under Code § 523(a)(6)[1] and an award of money damages in satisfaction of that debt.

## JURISDICTION

The jurisdiction of this court is now founded upon Section 157(a), Title 28, U.S.C., added by Section 104(a) of the Bankruptcy Amendments and Federal

---

1. See n. 2, infra.

Judgeship Act of 1984, P.L. 98–353, July 10, 1984, the congressional response to *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) which held that the grant of power to bankruptcy judges under section 241(a), P.L. 95–598 was unconstitutional. Since, however, 28 U.S.C. § 157 was not effective until July 10, 1984 and the petition in this case was filed prior to that date, the jurisdiction of this court in this proceeding rests upon the Emergency Resolution For The Administration of Bankruptcy System ("Emergency Resolution"), adopted by the United States District Court for the District of Connecticut, effective December 25, 1982. *See White Motor Corp. v. Citibank, N.A.*, 704 F.2d 254 (6th Cir.1983); *In re Hansen*, 702 F.2d 728 (8th Cir.1983), *cert. denied sub nom., First Nat'l Bank of Tekamah, Neb. v. Hansen*, 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983); *In The Matter of Braniff Airways, Inc.*, 700 F.2d 214 (5th Cir.1983), *aff'g* 27 B.R. 231 (N.D.Tex.1983), *cert. denied sub nom., American Airlines, Inc. v. Braniff Airways, Inc.*, 461 U.S. 944, 103 S.Ct. 2122, 77 L.Ed.2d 1302 (1983); *In re Q1 Corporation*, 28 B.R. 647, 10 B.C.D. 522 (E.D.N.Y.1983); *Moody v. Martin*, 27 B.R. 991, 10 B.C.D. 575 (W.D.Wis.1983); *In re Color Craft Press, Ltd.*, 27 B.R. 962, 10 B.C.D. 182 (D.Utah 1983); *In re Northland Point Partners*, 26 B.R. 1019 (E.D.Mich. 1983) (all of which uphold the validity of similar or identical resolutions). *Contra In the Matter of Seven Springs Apartments*, 33 B.R. 458, 10 B.C.D. 634 (Bkrtcy.N.D.Ga. 1983) (providing a comprehensive analysis of problems related to similar resolutions). While the underpinnings of the various resolutions adopted by the district courts are subject to divergent opinion, the consensus of the circuit courts which have reviewed the resolutions appears to be that 28 U.S.C. § 1471 was not completely rejected, leaving the district court with jurisdiction, *inter alia*, to refer matters to bankruptcy judges. *In re Hansen, supra; In re Braniff Airways, Inc., supra; White Motor Corp. v. Citibank, N.A., supra.*

Paragraph (c)(1) of the Emergency Resolution, which tracks 28 U.S.C. § 1471, provides:

(c) Reference to Bankruptcy Judges

(1) All cases under Title 11 and all civil proceedings arising under Title 11 or arising in or related to cases under Title 11 are referred to the Bankruptcy Judges of this District.

In all civil proceedings thus referred, a bankruptcy judge may enter final orders and judgments except in related proceedings where the parties have not consented to such entry. Emergency Resolution ¶¶ (d)(2), (d)(3)(B).

"Related proceedings" are defined, for purposes of determining when a bankruptcy judge may enter a dispositive order, as "those civil proceedings that, in the absence of a petition in bankruptcy, could have been brought in a District Court or a State Court."

I conclude that the instant adversary proceeding is not a related proceeding, as defined by the Emergency Resolution ¶ (d)(3)(A). That paragraph specifically excludes proceedings to determine dischargeability of particular debts from related proceedings. As to C.B.C.'s claim for damages, the Emergency Resolution ¶ (d)(3)(A) lists several nonexclusive categories of proceedings that are not related proceedings, including the "allowance of and objection to claims against the estate ... and similar matters." Paragraph (d)(3) further states: "A proceeding is not a related proceeding merely because the outcome will be affected by state law." Here C.B.C.'s claim for damages is nothing more than the assertion of a claim by a creditor against a debtor which is denied by the debtor.

It is preferable to permit parties to litigate their entire claim against a debtor's estate in a single forum. To require a creditor, who succeeds in a dischargeability proceeding, to litigate the damages aspect of his claim in another forum would serve no useful purpose, but rather would delay the efficient administration of justice and waste the time, effort, and resources of both parties. For that reason, the parties

consented, during a pretrial conference, to the entry of a judgment on the damages issue in the event that the dischargeability issue was decided in C.B.C.'s favor. Therefore, even if the litigation of C.B.C.'s claim for damages is a related proceeding, this court has jurisdiction to enter judgment on that issue. *See* Emergency Resolution ¶ (d)(3)(B).

## DISCHARGEABILITY

### CODE § 523(a)(6)

During the early morning hours of July 10, 1981, Leamond Suggs was walking in the side lot of The United Church located on Dixwell Avenue, New Haven, Connecticut near the intersection of Admiral Street. The area where Suggs was walking was close to C.B.C.'s place of business. As Suggs was walking in a westerly direction toward a fence abutting C.B.C.'s property, he saw flames from a fire on that property and then he noticed two men jumping down from C.B.C.'s fence.

As the two men approached him, he saw one of them make a throwing gesture toward the ground. When the two men were within six or seven feet from him, they turned to their right and began to walk toward Dixwell Avenue. Suggs followed. When the men reached Dixwell Avenue, an automobile drove up behind them near Christ Church and sounded its horn. The automobile then stopped, and the two men got in. As the men were getting into the automobile, Suggs walked behind and within three or four feet of the vehicle.

Dixwell Avenue in the area of Christ Church was very well illuminated by mercury street lights, and because of that illumination and his close proximity to the vehicle, Suggs was able to see the driver and the vehicle's Connecticut license plate number, 200 AFK.

When members of the New Haven arson squad, which consists of police officers and fire fighters, arrived at the scene, Suggs identified himself and described what he saw. After giving a statement, Suggs accompanied an investigating officer to the area where he saw one of the men make the throwing gesture. A pair of gloves was observed at that location. The gloves were described as relatively new, light weight, white canvas work gloves with an unusual red stitching. The gloves contained an odor of a flammable liquid.

The investigating officers thereafter ascertained that the vehicle was registered to Capozziello's wife, and that it had been located in Bridgeport. Members of the arson squad then drove Suggs to the area where the vehicle was parked to see if he could positively identify the vehicle. By then it was about 6:00 A.M., and when Suggs and the officers reached an intersection which was some distance from the subject vehicle, he exclaimed, "That's the car," meaning that a vehicle parked ahead was the vehicle he had seen on Dixwell Avenue in the area of the fire. As the arson squad vehicle got closer to the subject vehicle, Connecticut license plate 200 AFK could be observed. Shortly thereafter, Capozziello was escorted from his residence, and Suggs identified him as the driver of the vehicle he had seen earlier that morning in New Haven. The vehicle was then parked in front of Capozziello's residence. A subsequent search of the trunk of that vehicle revealed a pair of white canvas work gloves with red stitching of the same type as was found behind The United Church.

Evidence during the trial further established that C.B.C. was the owner of two tractor type trucks, that each truck had been totally destroyed by a separate, rapid burning, accelerated fire, and that a flammable liquid was present at the point of origin of each of the fires which, according to the expert witnesses, supported the conclusion that the damage to each truck was caused by arson.

The evidence also demonstrated that C.B.C. was a small business, minority contractor engaged in the demolition business in the New Haven area and that Capozziello's family was involved in the demolition business in the Bridgeport area. C.B.C.'s business had grown in the immediately pre-

ceding years to the point where it was able to break into the Bridgeport market and to compete with the Capozziello family for jobs in that area. Within a short time before the fire, C.B.C. had submitted successful rival bids to bids submitted by the Capozziello family for demolition contracts.

The evidence recounted here, is sufficient to establish the following facts:

(1) C.B.C.'s trucks were intentionally destroyed by arsonists and

(2) The arsonists were agents of Capozziello.

Under Code § 523(a)(6), an individual debtor may not obtain a discharge from any debt for a willful and malicious injury by the debtor to another entity or its property.[2] The legislative history of that section indicates that the term willful means "deliberate or intentional," S.Rep. No. 989, 95th Cong., 2nd Sess. at 79 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5864. The legislative history also explains that malice means more than a reckless disregard for a person or his property, and although courts apply various shades of meaning to that element of the (a)(6) test, it appears that the greater weight of authority holds that proof of malice requires evidence of an intent to do harm rather than merely an intentional act which causes an injury. *See In re Long*, 774 F.2d 875 (8th Cir.1985), *citing In re Cecchini*, 37 B.R. 671 (Bankr.App. 9th Cir. 1984); *In re Compos*, 768 F.2d 1155 (10th Cir.1985); *In re Held*, 734 F.2d 628 (11th Cir.1984).

■ Turning to the facts presented here, there is no question but that Capozziello's conduct in having C.B.C.'s trucks destroyed by arsonists was intentional and deliberate and therefore willful, and that it was in-

tended to do harm to C.B.C. and was therefore "malicious." Accordingly, Capozziello's debt, resulting from the fire, falls within the § 523(a)(6) exception to the dischargeability of debts. *Cf. Aetna Life & Casualty Co. v. Purk*, 28 B.R. 234 (Bkrtcy. S.D.Ohio 1983) (debtor intentionally set fire to his house); *In re Dynda*, 19 B.R. 817 (Bankr.M.D.Fla.1982) (smoke damage caused by fire intentionally set by debtor in neighbor's apartment); *In re Glazer*, 25 B.R. 329, 10 B.C.D. 178 (Bankr.N.D.Cal. 1982) (intentional tortious damage to property).

## B.

## DAMAGES

C.B.C. seeks damages for (1) the destruction of its two vehicles, (2) the loss of profits on two demolition contracts, and (3) the loss of its ability to continue in business.[3]

### 1.

■ The measure of damages for injury to personal property is the difference in the item's market value immediately before and after the injury, *see Youngset, Inc. v. Five City Plaza, Inc.*, 156 Conn. 22, 27, 237 A.2d 366 (1968), but where the property is totally destroyed, damages are measured by the market value of the property at the time of the destruction. *See* 22 Am.Jur.2d §§ 145, 146 at 210, 212; *see Stoll v. Judd Co.*, 106 Conn. 551, 138 A. 479 (1927).

I am persuaded by the evidence offered by C.B.C. that both vehicles were totally destroyed by the arsonists engaged by Capozziello. Consequently, a determination of the value of the vehicles immediately before their destruction is required.

---

**2.** Code § 523(a)(6) provides:

A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

**3.** Paragraph 3B of C.B.C.'s complaint alleges damage to its vehicles. Paragraph 3C of the

complaint alleges "... a loss of income to its business of construction and demolition work ...". Evidence was offered during the trial on the subject of lost income from Capozziello's interference with two C.B.C. contracts and the inability of C.B.C. to continue in business as a result of the firebombing of its vehicles. Those matters were also discussed in the post trial briefs of the parties.

■ Capozziello contends that the condition of C.B.C.'s trucks before the fire was not established therefore damages should not be awarded for to do so would require the court to indulge in speculation and conjecture. Although C.B.C. has not established, by the testimony of an expert witness or otherwise, the precise mechanical condition of the vehicles, other than evidence that they were in running condition before the fire, Capozziello, who had them destroyed, cannot benefit from the absence of that evidence. A tortfeasor may not destroy the property from which evidence on its condition might be derived and then defeat the property owner's claim for damages on the basis that its previous condition had not been established. *Accord Dale System, Inc. v. Time, Inc.,* 116 F.Supp. 527 (D.Conn.1953); *Grant v. West Haven Gardens Co.,* 181 Conn. 379, 387–8, 435 A.2d 970 (1980); *Crowell v. Palmer,* 134 Conn. 502, 511, 58 A.2d 729 (1948).

■ C.B.C. offered the testimony of an expert witness that its 1964 White tractor had a market value of $12,000.00 and that its 1970 Mack tractor had a market value of $10,000.00 prior to their destruction by the fire. The testimony of that witness is credible. I accordingly find that the personal property loss from the fire is $22,000.00.

### 2.

C.B.C. offered testimony to prove that it had successfully bid on two demolition projects within a short period before the fire and that as an immediate consequence of the destruction of its trucks, the company was unable to complete the projects. C.B.C. also offered evidence that its bids were based upon a projected net profit of approximately 25%, but as a result of the fire, instead of realizing $33,000.00,[4] C.B.C. actually lost money. Capozziello, on the other hand, argues that C.B.C.'s uncertainty about projected expenses in the performance of the two demolition contracts should defeat C.B.C.'s recovery of damages.

**4.** *See* C.B.C.'s post trial brief at 12. The total

■ It is clear from the evidence that the loss of its trucks put a significant financial strain on C.B.C. and impaired its ability to perform under the two demolition contracts. As previously noted, a tortfeasor cannot defeat an award of damages against him by pointing to a weakness in his victim's chain of proof which was caused by his intentional tort. Obviously C.B.C. cannot prove with certainty the exact amount of profits it lost. That defect may, however, be overcome by reasonable reliance upon inferences and estimates to prove with reasonable certainty what the profits probably would have been. *See Burr v. Lichtenheim,* 190 Conn. 351, 360, 460 A.2d 1290 (1983). As the District Court for this district held in *Heyman v. Kline,* 344 F.Supp. 1110 (D.Conn.1972), *rev'd on other grounds,* 456 F.2d 123 (2d Cir.1972) (involving the tortious interference with business relations):

> The nature of the case is such as the wrongdoer has chosen to make it: and, upon every consideration of justice, he is the party who should be made to sustain all the risk of loss which may arise from the uncertainty pertaining to the nature of the case and the difficulty of accurately estimating the results of his own wrongful act.

*Id.* at 1116, *quoting Seidell v. Taylor,* 151 Pac. 41, 86 Wash. 645 (1915).

■ I accordingly find that the profit projected by C.B.C. for the contracts is a reasonable basis for assessing damages caused by Capozziello's intentional act and that $33,000.00 is a reasonable amount of damages for Capozziello's interference with C.B.C.'s performance under these contracts.

### 3.

■ C.B.C. further claims that as an additional consequence of Capozziello's tortious conduct, it was deprived of financial resources and could not meet the requirements for bonding and that without bonding, it was unable to bid on future demoli-

bid on the two jobs was $133,000.00.

tion contracts. Thus, in essence, C.B.C. contends that the fire caused it to go out of business.

Although courts in this district have adopted a liberal rule for proof of damages resulting from tortious interference with contracts, *see Dale System v. Time, Inc., supra,* 116 F.Supp. at 533–4, so that "damage for torts need not be proved by a degree of certainty which the defendant's conduct has made impossible," *id.* at 533, damages are nonetheless only allowed "to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty." *Doeltz v. Longshore, Inc.,* 126 Conn. 597, 600, 13 A.2d 505 (1940), *citing,* Restatement (First) of Contracts § 331, *Burr v. Lichtenheim, supra,* 190 Conn. 351, 360, 460 A.2d 1290.

The evidence in this proceeding supports a finding that prior to 1980 C.B.C. operated at a loss, but by the end of that year, it had a pretax profit. The evidence further reveals that for the period ending June 30, 1981, C.B.C. had a pretax profit of $161,000.00 and that for the year 1981, C.B.C. had an after tax profit. Although C.B.C. has sustained the burden of proving that the destruction of its trucks was a substantial factor in its financial decline, its short history of profitability affords an insufficient basis for a finding that the firm would have been profitable in the future. C.B.C. has therefore failed to remove its claim for damages for the interference with its ability to continue in business from the realm of speculation and conjecture as there is no basis for calculating with any degree of certainty the amount of any such damage. Furthermore, even nominal damages are inappropriate here. *Cf. Taylor v. Sugar Hollow Park, Inc.,* 1 Conn.App. 38, 467 A.2d 935 (1983) ("unlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss; [citation omitted;] it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered actual loss"), *citing Herman v. Endriss,* 187 Conn. 374, 377, 446 A.2d 9 (1982); *Harry A. Finman & Son, Inc. v. Connecticut Truck & Trailer Service Co.,*

169 Conn. 407, 415, 363 A.2d 86 (1975); *Goldman v. Feinberg,* 130 Conn. 671, 37 A.2d 355 (1944).

### C.

### CONCLUSION

On the basis of the foregoing, I conclude that:

(1) the debt resulting from Capozziello's willful and malicious activity is nondischargeable under Code § 523(b)(6) and

(2) C.B.C. is entitled to $22,000.00 for the total destruction of its trucks and $33,000.00 for the tortious interference with its contracts.